## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**INOFIN INCORPORATED,**                                  Chapter 7
    Debtor                            Case No. 11-11010-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MARK G. DeGIACOMO, CHAPTER 7
TRUSTEE OF INOFIN INCORPORATED,**
    Plaintiff
v.                                                       Adv. P. No. 12-1091
**TOBIN & ASSOCIATES, P.C. and
RICHARD J. TOBIN,**
    Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matters before the Court are the Motion of the Defendants, Tobin & Associates,

P.C. and Richard Tobin (collectively, the "Defendants," or "Tobin") to Dismiss Counts I and

II of the four-count Complaint filed against them by Mark G. DeGiacomo, the Chapter 7

trustee (the "Trustee") of the estate of Inofin Incorporated ("Inofin" or the "Debtor");[1] and

---

[1] Through Counts III and IV, the Trustee seeks to avoid and recover alleged
preferential payments to Tobin totaling $110,000 pursuant to 11 U.S.C. §§ 547(b) and
550.

1

the Chapter 7 Trustee's Objection to the Motion to Dismiss.  The Court heard the matters

on August 14, 2012 and took them under advisement.  The issues presented include

whether the Defendants can prevail on their *in pari delicto* defense at this stage in the

proceeding; whether the statute of limitations bars the Trustee's claims; and whether the

Trustee has standing to assert the claims set forth in Counts I and II.

## II. BACKGROUND

On February 9, 2011, numerous investors in the Debtor filed an involuntary Chapter

7 petition against it (the "Petition Date").  On February 16, 2011, this Court entered an

Order for Relief under Chapter 7.  On February 16, 2011, Mark G. DeGiacomo was

appointed the Chapter 7 Trustee of the bankruptcy estate of the Debtor.

On April 14, 2011, the Securities and Exchange Commission ("SEC") filed an

enforcement action in the United States District Court for the District of Massachusetts

against Inofin, several of its principals and agents, including Michael J. Cuomo ("Cuomo"),

the Debtor's President, Kevin J. Mann ("Mann"), the Debtor's Chief Executive Officer, and

Melissa George ("George"), the Debtor's Chief Operating Officer and Chief Financial

Officer, alleging that they violated, among other laws, the anti-fraud provisions of federal

securities laws, namely Section 17(a) of the Securities Act of 1933 and Section 10(b) of the

Securities and Exchange Act of 1934, *see* 15 U.S.C. §§77q(a) and 78j(b). The Defendants

attached to their Memorandum in Support of the Motion to Dismiss the complaint filed by

the SEC in the United States District Court for the District of Massachusetts.[2]

---

[2] The Court observes that the Trustee borrowed heavily, sometimes quoting
verbatim, from that complaint without attribution.  The Court also observes that the

2

At the hearing held on August 14, 2012, the parties submitted a copy of a "Consent" executed by Cuomo, a copy of a "Consent" executed by Mann, as well as copies of Final Judgments pursuant to which Cuomo agreed to the entry of a judgment "for disgorgement of $1,272,914.57, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $440,181.42 for a total of $1,713.095.90 and a civil penalty in the amount of $150,000. . .;" and Mann agreed to the entry of a  judgment "for disgorgement of $733,944.00, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $170,762.00 for a total of $904,706.00 and a civil penalty in the amount of $150,000. . . ."  The Consents executed by both Cuomo and Mann provided that they consented to the entry of final judgment "[w]ithout admitting or denying the allegations of the complaint . . . ."  Nevertheless, the Consents each provided the following:

> Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceeding."  17 C.F.R. § 202.5  In compliance with this policy, Defendant agrees:  (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint.  If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in

Trustee omitted numerous critical allegations from the SEC complaint against Cuomo, Mann and George in crafting his own Complaint against the Defendants.

litigation or other legal proceedings in which the Commission is not a party.[3]

## III. THE TRUSTEE'S COMPLAINT

### A. Introduction

The Trustee filed his four-count Complaint on April 19, 2012.  In his Complaint, he alleged facts which the Court must accept as true for purposes of the Defendants' Motion to Dismiss.  *See* Sanchez ex rel. D.R.-S v. U.S., 671 F.3d 86, 107 (1st Cir. 2012), *petition for cert. filed,* 81 U.S.L.W. 3130 (Sept. 13, 2012).  The Court has set forth the allegations of the Trustee's Complaint verbatim or paraphrased them below.  The Court also has noted those portions of the Trustee's Complaint that track allegations set forth in the SEC's complaint.

### B. The Defendants

Defendant Tobin & Associates, P.C. is a Massachusetts professional corporation with a principal place of business in Taunton, Massachusetts.  Richard J. Tobin is the president of Tobin & Associates (individually or collectively, "Tobin").  Richard J. Tobin is a certified public accountant ("CPA") licensed by the Commonwealth of Massachusetts since approximately 1968.

---

[3] Section 202.5(e) of the Code of Federal Regulations provides in pertinent part:

(e) The Commission has adopted the policy that in any civil lawsuit brought by it or in any administrative proceeding of an accusatory nature pending before it, it is important to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conduct alleged did not, in fact, occur. Accordingly, it hereby announces its policy not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings.

17 C.F.R. § 202.5(e).

C. The Debtor's Business Model

By way of background, the Trustee described the Debtor's business model and affiliated business entities and operations. The Debtor is a privately owned Massachusetts corporation that was incorporated in 1994.  It maintained a principal place of business  in Rockland, Massachusetts.  The majority of the shares of the Debtor were owned by Cuomo and Mann.

The Debtor primarily was engaged in the business of purchasing and servicing sub-prime used car loans. Typically, the Debtor and certain used car dealerships would sign an agreement establishing the Debtor as a sub-prime lending source for the dealerships' customers and establishing the terms pursuant to which the Debtor would purchase retail installment sales contracts.  *See* SEC complaint at ¶ 23. To purchase a car under the Debtor's indirect lending program, the purchasing consumer signed a retail installment sales contract generated by the Debtor (the "Installment Sales Contract").  *See* Id. at ¶ 24.  After the Installment Sales Contract was signed by the consumer, the dealer and the Debtor would sign a Partial Purchase and Assignment Agreement pursuant to which the dealer would assign a portion of the payment stream in the Installment Sales Contract to the Debtor.

Inofin's lending capital came from investors who loaned it money for a term of three years in exchange for a fixed rate of interest, ranging from nine percent to over fifteen percent per year. In exchange for investor money, Inofin gave its investors a loan agreement and a promissory note. Id. at ¶ 34.  With the exception of a small number of preferred

5

investors, the majority of the Debtor's investors did not obtain security for their loans.  As

of the Petition Date, there were approximately 275 investors with outstanding loans to the

Debtor.

     D. The Debtor's Affiliated Business Entities and Operations

During 2004, Inofin and its principals began using investor money for lending

activities other than sub-prime auto loan financing. Id. at ¶ 39.  Specifically, in the summer

of 2004, Cuomo and Mann established four corporations, three in Massachusetts and one

in Rhode Island, for the purpose of owning and running four separate used car dealerships.

As established, Cuomo and Mann were the stockholders, officers and directors of those

entities. They called these entities the "Drive USA stores" (collectively, the "Drive entities").

Id.

At around the same time, Cuomo and Mann also established three limited liability

companies, two in Massachusetts and one in Rhode Island, for the purpose of purchasing

real estate and developing the commercial dealership facilities.  As established, Cuomo and

Mann were the managers and members of those entities.  See Id. at ¶ 40.  Finally, in

February 2004, Cuomo and Mann formed Prime Real Estate Associates, LLC, a

Massachusetts limited liability company, for the purpose of acquiring and developing

residential real estate. The real estate entities were collectively referred to as the "Prime

entities." See Id. at ¶¶ 41-46.

Cuomo and Mann funded the establishment of their new businesses entirely with

Inofin investor money. By the end of 2005, Inofin had lent the Drive and Prime entities

approximately $12.2 million of investor money. At the time, those Inofin receivables represented approximately one third of Inofin's total assets. *See* Id. at ¶ 50.

By the end of 2008, Inofin had lent the Drive and Prime entities approximately $17 million, which represented twenty seven percent of Inofin's total assets. *See* Id. at ¶ 51. By the end of 2009, the Drive and Prime entities owed Inofin approximately $25.5 million, which represented forty four percent of Inofin's total assets. Id.

E. The Debtor's License to Operate from the Massachusetts Division of Banks

To operate its motor vehicle financing business, Inofin was required to be licensed by the states in which it made sub-prime auto loans. Id. at ¶ 32. The primary licensing authority for Inofin was the Massachusetts Division of Banks (the "Division of Banks"). Id. Without a license from the Commonwealth of Massachusetts, Inofin would have had no legal basis to continue operating in Massachusetts as a motor vehicle finance company.

To maintain a motor vehicle finance company license in the Commonwealth of Massachusetts, the Division of Banks required Inofin to maintain a positive net worth of at least $20,000. Additionally, to maintain the license, the Division of Banks required Inofin, among other things, to file a License Renewal Application annually in September. The regulations of the Division of Banks required that the application include annual financial statements that (1) had been reviewed or audited by an independent Certified Public Accountant, and (2) had been prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). *See* Id. at ¶¶ 32, 125, 126, 128, 129.

F. Inofin's Unsuccessful Attempt to Divest the Drive Entities

7

In 2005, Inofin became concerned that mounting losses at the Drive entities would adversely affect Inofin's financial statements and cause Inofin to be out of compliance with the net worth requirements of the Division of Banks.  By the end of 2005, the Drive entities had collectively accumulated over $3.6 million in net losses.  *See* Id. at ¶ 131. During 2005, in an attempt to separate the Drive entities, and their substantial operating losses, from Inofin, Cuomo and Mann entered into a transaction to sell the Drive entities to Mark Walsh ("Walsh"), a long-time friend of Mann and, at the time, both an employee of Inofin and an Inofin investor.  *See* Id. at ¶ 132.  Nevertheless, from the date of the sale of the Drive entities through 2010, Cuomo and Mann continued to exercise management and financial control over the Drive entities through George, Inofin's Chief Financial Officer, who also acted as the Chief Operating Officer for the Drive entities and Mann who oversaw George's management. *See* Id. at ¶ 133.  As such, George and Mann exercised the real management and control of the Drive entities.  Id.  Moreover, the Drive entities were completely under the financial control of Cuomo and Mann through Inofin, which was the principal financier of the Drive entities. Id.  Without the financial support of Inofin, the Drive entities would have collapsed almost immediately. Id.

G. The Debtor's Former Accountants

From the late 1990's through the summer of 2006, Inofin engaged the firm of Sharkansky & Company, P.C. ("Sharkansky") to perform an annual audit of its financial statements for submission to the Division of Banks.  In 2006, after the sale of the Drive entities, and in connection with Sharkansky's preparation of Inofin's year-end 2005

8

financial statements, Sharkansky informed Inofin that in order to issue an opinion that Inofin's year-end 2005 financial statements were compliant with GAAP, it would require consolidation of the Drive entities' accounts, notwithstanding the sale. Id. at ¶ 138. Sharkansky further informed Inofin that even if the financial statements remained unconsolidated, the firm would require a determination of the need, if any, for a valuation allowance with respect to the loans to the Drive entities. Id. After reviewing the Drive balance sheets, Sharkansky further informed Inofin that the firm believed that there should be an impairment taken on the Drive loans. Id. at ¶ at 141.

Cuomo and Mann rejected Sharkansky's conclusions and recommendations and instead continued to request an audit of the unconsolidated financial statements. Ultimately, in order to submit an application to the Division of Banks, Sharkansky agreed to issue an audit opinion that noted a scope limitation and a departure from GAAP. Id. at ¶ 142. Sharkansky's scope limitation, as contained in the September 27, 2006 auditor's report, noted that Inofin's unconsolidated financial statements contained notes receivable from related entities for which it could not determine the need for a valuation allowance. In a note to the financial statements, Sharkansky also disclosed that the total amount of receivables due from Drive and Prime was $13 million and that the Drive and Prime entities had a cumulative loss of $3.5 million for the year end 2005. Id. at ¶ 143.

Sharkansky's audit report also noted a departure from GAAP. In Sharkansky's professional opinion, in order to comply with GAAP, Inofin's financial statements would have to consolidate the financial accounts of the Drive and Prime entities, which were

9

owned or controlled by Inofin's principal officers. Id. at ¶ 144.

In September 2006, Inofin submitted its License Renewal Application with the unconsolidated financial statements, along with Sharkansky's GAAP-exception audit opinion. The Division of Banks rejected this submission as failing to comply with the requirement that the financial statements be prepared in conformance with GAAP. Id. at ¶ 145.

During 2007, Inofin engaged Sharkansky to provide a review report, instead of an audit, for Inofin's 2006 year-end financial statements. Despite the change in the type of engagement, however, Sharkansky once again determined that in order to issue an opinion that Inofin's financial statements were GAAP-compliant, it would require consolidation of the results of the Drive and Prime entities. Id. at ¶ 148. In addition, Sharkansky informed Inofin that a review of Inofin-only unconsolidated financial statements would require Sharkansky to determine the need, if any, for a valuation allowance on the Drive loans. Id. at ¶ 149.

By the end of 2006, the Drive entities, according to their own financial statements, had lost $3.6 million in 2005 and another $1.5 million in 2006, for a total two-year loss of $5.1 million. Their liabilities exceeded their assets by approximately $5 million, and they owed Inofin over $5 million. Id. at ¶ 151. Based on the consistent history of Drive losses, it was reasonably apparent that the Drive entities would not generate sufficient cash flow to repay the Inofin loans. Id. at ¶ 152.

In June 2007, Sharkansky told Inofin that, unlike the year before, it would insist that

10

Inofin write down the value of the Drive receivables by $5 million. This write down would have resulted in a $5 million loss on Inofin's income statement for the year ended December 31, 2006 and a reduction of Inofin's assets of the same amount as of December 31, 2006. Id. at ¶ 153. Inofin rejected Sharkansky's approach and recommendations concerning the contemplated review of Inofin's financial statements and, therefore, began to search for a new CPA to assist Inofin with its accounting work going forward.[4]

H. Tobin & Associates' Engagement for the Review of Inofin's Year-End Financial Statements

As set forth in an engagement letter executed in July of 2007, Inofin engaged Tobin & Associates to review Inofin's December 31, 2006 financial statements and to issue an accountant's report in accordance with Statements on Standards for Accounting and Review Services ("SSARS"), issued by the American Institute of Certified Public Accountants (the "AICPA"). It was understood between the parties that Richard Tobin

---

[4] The Trustee's Complaint omitted the following allegations set forth in the following numbered paragraphs of the SEC's complaint:

155. Rather than accept the reality of the situation as explained through Inofin's professional, independent accountants, Cuomo, Mann, and George set out to find a "local small one man type CPA" who would issue review reports acceptable to the Division of Banks on company financials that would hide Inofin's insolvency by not consolidating the Drive losses and by not writing-down the Drive receivables to reflect the enormous risk that these non-performing entities would never be able to repay Inofin's loans.

156. They found their accountant in R.T. [Richard Tobin], a man who George referred to as "Magoo"- a reference to the severely nearsighted cartoon character. . . .

would personally oversee or perform all of the work required by the engagement.  At the time Tobin was engaged by Inofin, he knew that it was planning to submit the review report in support of its renewal application with the Division of Banks.

Shortly after being engaged by Inofin, in or around July of 2007, Tobin met with at least one partner at Sharkansky, Scott Estabrooks, to discuss the Inofin account. Sharkansky provided Tobin with complete access to Sharkansky's files concerning its past work for Inofin, including Sharkansky's audit report concerning the 2005 financial statements.  In one or more discussions at the start of Tobin's engagement, Sharkansky informed Tobin that the firm was being replaced as a result of a dispute over the way Inofin wanted to account for the money that the Drive entities owed Inofin.  Sharkansky also informed Tobin that the collectability of the entire balance due from the Drive entities was in question and that had Sharkansky continued as Inofin's outside accountant it would have required a reserve against the Drive entities' receivable.  Id. at ¶ 156.  Documents in Sharkansky's files, to which Tobin had access for review and copying, also confirmed Sharkansky's position on the need for a reserve in connection with the Drive receivables.

In connection with Tobin's engagement, Inofin provided Tobin with two sets of Inofin financial statements for review:  one consolidated and one unconsolidated. Id. at ¶ 157.[5]  Inofin's consolidated financial statements purported to consolidate Inofin's related

_____

[5] The SEC complaint contained the following allegation:

157.  Inofin had R.T. review two sets of Inofin financial statements:  one consolidated and one unconsolidated.  Cuomo, Mann, and George designed both sets of financial statements to hide the financial effect of the

parties, but consolidated only the Prime entities and left the Drive entities unconsolidated. The accounting effect of this preparation excluded the Drive entities' $5 million in losses, thus omitting the fact that Inofin had a negative net worth of at least $4 million. Id. at ¶ 158.

Inofin's unconsolidated financial statements showed the loans to the Drive entities as Notes Receivable from Related Parties, an asset on Inofin's balance sheet. Id. at ¶ 159. These financial statements, however, did not reflect any valuation allowance or impairment for these loans. Id. Sharkansky's review of these same Drive receivables caused them to insist that Inofin take a valuation allowance or impairment of $5 million, which would have similarly caused Inofin to reflect a negative net worth of at least $4 million. Id.

During the course of his review procedures, Tobin had the opportunity to request from Inofin a copy of the financial statements for each of the Drive entities for 2005 and 2006. Tobin did not receive or review these statements.[6]

_____

Drive entities' performance on Inofin's financial statements.

[6] The Trustee's Complaint omitted the following allegation in the SEC complaint:

160.   During the course of review procedures, R.T. asked Cuomo for a copy of the financial statements for each of the Drive entities for 2005 and 2006. Cuomo answered this request by telling R.T. that Inofin could not provide these financial statements because Inofin had sold these entities in 2005. This statement was not true because (1) Inofin had previously provided Drive entity financial statements to S&Co., and (2) Cuomo knew that Inofin was in control of the Drive entities and that the sale to Walsh had been a sham.

On September 10, 2007, Tobin issued a review report stating that he had performed a review of Inofin's 2006 year-end *consolidated* financial statements and that he was not aware of any material modifications which needed to be made for them to be in conformity with GAAP, despite the fact that "the statements did not consolidate the effects of the Drive entities." With respect to consolidation of the Drive entities, Tobin noted that the Drive entities were "former variable interest entities," but that they had been "sold in 2005." Id. at ¶ 161.[7]  At the time he issued this review report, Tobin knew or reasonably should have known, based on information available to him, that the Drive entities continued to be substantially controlled by and dependent upon Inofin or its officers, Cuomo and Mann.[8]

On September 10, 2007, Tobin also issued a review report stating that he had performed a review of Inofin's 2006 year-end *unconsolidated* financial statements.  He noted in his report that the financial statements contained a departure from GAAP as they did not reflect the consolidation of the Drive and Prime entities as required by GAAP.  Instead, the financial statements simply reflected the monies owed to Inofin from the Drive and Prime entities on the balance sheet as "Notes Receivable from Related Parties." Id. at ¶ 162.  With

---

[7] The Trustee's Complaint omitted the remaining allegation in ¶ 161 of the SEC complaint:

> In order to receive this report of GAAP-compliant consolidated financial statements, Cuomo, Mann, and George knowingly or recklessly misled R.T. by failing to inform him that the Drive entities' sale had been a sham and that they continued [to] exercise management and financial control over these entities.

[8] *See* notes 10 and 11 *infra*.

14

regard to the Drive entities' receivables, Tobin stated in Note 7 of the review statement with

respect to the unconsolidated financial statements that he was "unable to determine

through review procedures the need, if any, for a valuation allowance for these variable

interest entities." Id.   At the time he issued his review report, based on information

available to him, Tobin knew or reasonably should have known of the need for a valuation

allowance for the Drive entities due to the uncollectability of the loans to those entities.

Further, based on information available to him, Tobin knew or reasonably should have

known that the appropriate valuation allowance or impairment was approximately $5

million, which would have caused Inofin to reflect a negative net worth of at least $4

million.[9]

In September 2007, Inofin submitted its License Renewal Application to the Division

_____

[9] The Trustee's Complaint departs from the SEC complaint.  The SEC complaint
contains the following allegation:

> 162.  On the same date, R.T. issued a review report stating that he had
> performed a review of Inofin's 2006 year-end unconsolidated financial
> statements.  He noted in his report that the financial statements contained
> a departure from GAAP as they did not reflect the consolidation of the
> Drive and Prime entities as required by GAAP.  Instead, the financial
> statements simply reflected the monies owed to Inofin from Drive and
> Prime on the balance sheet as "Notes Receivable from Related Parties."
> With regard to the Drive receivables, R.T. stated in a note that he was
> "unable to determine through review procedures the need, if any, for a
> valuation allowance for these variable interest entities."  In order to
> receive this statement in R.T.'s report disclaiming the ability to determine
> the collectability of the Drive loans, Cuomo, Mann, and George knowingly
> or recklessly misled R.T. about their knowledge of these entities' inability
> to repay and their ability to provide Drive financial records.

of Banks. Id. at ¶ 163. The License Renewal Application included a copy of Inofin's 2006

year-end *consolidated* financial statements and Tobin's review report regarding GAAP

compliance. Id. at ¶ 164. These submitted financial statements indicated that Inofin had

total assets worth $49.8 million and total liabilities of $49.4 million, representing a total net

worth of approximately $400,000, well in excess of the $20,000 minimum net worth

required by the Division of Banks. Id. At the time he prepared the consolidated financial

statements for submission to the Division of Banks, Tobin knew or acted in reckless

disregard of the fact that Inofin's net worth was inflated by at least $5 million because of

the failure to consolidate the losses of the Drive entities.[10]

Had Tobin properly consolidated the losses of the Drive entities, and had Inofin's

net worth properly reflected these losses, Inofin's reviewed financial statements would

have revealed a substantial negative net worth to the Division of Banks. In light of such a

negative net worth, which would have been below the $20,000 minimum net worth

requirement, the Division of Banks, on information and belief, would not have renewed

Inofin's license. As a result, Inofin would have been forced to cease operations and would

not have been able to originate any new loans after late 2007, which loans have now become

claims against the Debtor's bankruptcy estate.

---

[10] The remaining allegations set forth in ¶ 164 of the SEC complaint set forth the
following:

> At the time of this submission, Cuomo knew or acted in reckless disregard
> of the fact that Inofin's net worth was inflated by at least $5 million
> because of the failure to consolidate the losses of the Drive entities.

The License Renewal Application also included a copy of Inofin's 2006 year-end *unconsolidated* financial statements and Tobin's review report noting that he was unable to determine the collectability of Inofin's loans to the Drive entities. Id. at ¶ 165. These financial statements showed that Inofin had total assets worth $46.9 million and total liabilities of $46.3 million, representing a total net worth of approximately $600,000, well and in excess of the $20,000 minimum net worth required by the Division of Banks. Id. At the time he prepared the *unconsolidated* financial statements for submission to the Division of Banks, Tobin knew or acted in reckless disregard of the fact that Inofin's net worth was inflated by at least $5 million because of the Drive losses and the uncollectability of the Drive receivables owed to Inofin.[11]

Had Tobin properly determined the collectability of Inofin's loans to the Drive entities and reflected an appropriate valuation allowance or impairment on Inofin's financial statements, Inofin's reviewed *unconsolidated* financial statements would have revealed a substantial negative net worth to the Division of Banks. In light of such a negative net worth, which would have been below the $20,000 minimum net worth

---

[11] The SEC complaint at ¶ 165 further provided:

At the time of this submission, Cuomo knew or acted in reckless disregard of the fact that Inofin's net worth was inflated by at least $5 million because of the Drive losses and the uncollectability of the Drive receivables owed to Inofin.

requirement, the Division of Banks would not have renewed Inofin's license.[12]  As a result,
Inofin would have been forced to cease operations and would not have been able to
originate any new loans after late 2007, which loans have now become claims against the
Debtor's bankruptcy estate.

The Trustee tracked the foregoing allegations against the Defendants with respect
to the Defendants' engagement for the review of Inofin's 2007 and 2008 year-end financial
statements.  In addition, the Trustee alleged that the Defendants failed to perform the
review engagements pursuant to the AICPA's SSARS.  According to the Trustee, Tobin's
work on each of his engagements with Inofin for the preparation of reviewed financial
statements and performance of related activities was governed by SSARS, including AR
Section 90, entitled "Review of Financial Statements," Source: SSARS No. 19.  Pursuant to
AR Section 90.21, Tobin had a duty to take additional steps beyond simply relying on
information supplied by management once he became "aware that information coming to
his . . . attention is incorrect, incomplete, or otherwise unsatisfactory."[13]

---

[12] The Trustee made the foregoing allegation on "information and belief."

[13] The Trustee omitted the allegations in the SEC complaint that George, who was
Tobin's contact person at Inofin worked to keep him in the dark.  The SEC complaint,
under the headings, "Keeping Magoo in the Dark" and "2008-$10 Million in Auto Loans
Sold at Discount, Magoo Still Kept in The Dark," set forth detailed allegations about
how the principals of Inofin concealed information from the Defendants, including the
following:

175.  On August 4, 2008, George wrote to Cuomo:  "I'm working on [R.T.]'s
list & I just noticed that he asked for Drive's tax returns for 2006?  He
didn't ask for it last year?  There's nothing on them that doesn't match, just
an odd request, I think?  Maybe he's trying to see if there was any truth to

18

With respect to Tobin's statement in Note 7 of his *consolidated* reviewed financials

for the years 2006, 2007, and 2008 that the Drive entities were "<u>former</u> variable interest

entities" (emphasis added), Tobin would have been able to determine the falsity of this

statement by doing any of the following, as prescribed by SSARS 90:

---

the numbers?  Hmmm.."

176.  Later the same day, in the same email chain, George wrote to Cuomo:
"I also think he wants to see who has been and is taking the losses.  I can
tell him that Mark [Walsh] will not give them to us."  This suggestion was
the same fabrication that Inofin had foisted on R.T. the previous year.

177.  In addition, Cuomo, Mann, and George all knowingly or recklessly
failed to inform R.T. that the auto loan receivables on Inofin's  year-end
2007 financial statements were artificially inflated by over $260,000
because they had not recorded the costs associated with Inofin's
discounted sales to MAF.

*** 

190.  During R.T.'s work reviewing Inofin's  financial statements for 2008,
he became more concerned about the money owed to Inofin by Drive and
Prime.  Although R.T. asked some questions of George concerning these
receivables, she actively worked to keep him from knowing the full extent
of their collectability problems.  For example, on July 9, 2009, George
wrote an email to Mann summarizing her stonewalling of R.T, She wrote:
"Hi just got out of a meeting with [R.T.].  He's closing in on me with the
prime/drive receivables . . . wants to meet with this Mr. Walsh and also
needs a personal financial statement from him.  He asked if he had any
assets and I said I'm pretty sure he does?  I think he lives in Raynham but
has a couple of other houses like one down south and one up north?  I
play dumb. . .I tell him I don't really deal with Mark, just his Management
team on Mondays when I review their budgets for the operating line.  I
told him Mark deals with you guys, as you're all 'bosses.' Also, he's lined
up what is owed on the houses . . . three over $1 Mil . . . oh  geez. . ."

(a) requesting that Inofin management consider the effect of the Drive entities' total dependence on Inofin in the determination of whether the Drive entities continued to be variable interest entities under FIN 46 valuation and communicate the results of its consideration to Tobin;

(b) considering management's response, if any, to Tobin's request for consideration;

(c) determining whether the financial statements were materially misstated based on management's response and Tobin's own understanding of the facts surrounding the sale transaction concerning the Drive entities in light of the ongoing dependent relationship; and

(d) performing additional procedures necessary to obtain limited assurance that there were not material modifications that should be made to the financial  statements in order for the statements to be in conformity with the applicable financial reporting framework.

Had Tobin undertaken any of these steps, he would have determined, as Sharkansky previously had, that in order to issue an opinion that Inofin's financial statements were GAAP-compliant, even under review standards, he should require consolidation of the Drive entities financial results. Such a consolidation of the Drive entities' losses, if properly investigated and determined, would have required a reduction of Inofin's stated net worth by at least $5 million, if not more, for each of the years for which Tobin reviewed the financial statements, thus resulting in a negative net worth as reported in the consolidated financial statements.

With respect to Tobin's statement in Note 7 of Inofin's *unconsolidated* financial statements for each of the years 2006, 2007 and 2008, Tobin would have been able to determine the need for a valuation allowance for the loans to the Drive entities by doing any of the following, as prescribed by SSARS 90:

20

(a) requesting that Inofin management consider the effect of the valuation allowance for the variable interest entities (including the Drive entities) and communicate the results of its consideration to Tobin;

(b) considering management's response, if any, to Tobin's request for consideration;

(c) determining whether the financial statements were materially misstated based on management's response and Tobin's own understanding of the uncollectability of the loans to the Drive entities; and

(d) performing additional procedures necessary to obtain limited assurance that there are not material modifications that should be made to the financial statements in order for the statements to be in conformity with the applicable financial reporting framework.

Had Tobin undertaken any of these steps, he would have determined, as Sharkansky had, that the appropriate valuation allowance or impairment was approximately $5 million, if not more, for each of the years for which Tobin reviewed the financial statements. Such a valuation allowance, if properly investigated and determined, would have caused Inofin to reflect a negative net worth of at least $2.6 million as reported in the consolidated financial statements for 2006, 2007 and 2008.

Instead of taking any of the steps identified above in order to properly prepare Inofin's consolidated and unconsolidated reviewed financial statements, Tobin simply relied on management's representations, all the while under the mistaken belief that the SSARS review standards did not require any additional activity on his part. Tobin's failure to understand or properly apply the relevant protocols set forth in the SSARS to his engagement led directly to Inofin's receiving successive license renewals for the years 2007, 2008 and 2009.  On information and belief, had the Division of Banks been aware of Inofin's

substantial negative net worth during any of these years, it would not have renewed

Inofin's license. As such, Inofin would have been forced to cease its business activities and

thus would not have been able to continue soliciting investor loans, which have now

become claims against the Debtor's bankruptcy estate. In addition, had Inofin been forced

to cease business as a result of its loss of its license during any of the years following 2007,

Inofin's insolvency would not have continued to deepen. Instead, by remaining in business

from 2007 through 2010 with an improperly-obtained license, Inofin substantially reduced

the funds that would be available for distribution to unsecured creditors through the

company's inevitable bankruptcy proceedings.

In November 2009, the Division of Banks commenced an examination of Inofin.  Id.

at ¶ 206. During the course of the examination, the Division of Banks learned that Inofin

had sold a substantial portion of its car loans to an unrelated third party, Mid-Atlantic

Financial Corp. ("MAF"), and that the financial effect of those transactions was not reflected

in any of the filings or certifications that Inofin had made with the Division.[14] Id. This

---

[14] The Trustee's Complaint omitted numerous allegations made by the SEC with respect to the sale of Inofin's auto loan portfolio to MAF.  The SEC complaint sets forth in part the following:

> 184.  During the calendar year 2008, Cuomo, Mann, and George sold off five times as much of the auto loan portfolio to MAF as they had in 2007, transferring approximately $10,384,000 worth of its subprime auto loan portfolio to MAF.  Of that amount, Inofin bought back approximately $1,958,000 worth of non-performing loans.  Again, the signatures of Cuomo, Mann, and George appear in the contract documents.

> 185.  Similar to the preceding year, George did not record in Inofin's books and records the detrimental financial consequences associated with sales

discovery raised a concern about Inofin's ability to maintain the minimum financial requirements necessary for licensure. Id. As a result of the Division of Banks' examination, in June 2010, Inofin and the Division entered a consent order that, among other things, directed Inofin to engage an accounting firm "to prepare and submit to the Division an audit of the financial statements for the year 2009" as well as "an audited 2008 year-end balance sheet and a 2008 income statement review." Id. The Consent Order entered by the Division of Banks specifically barred Tobin from preparing the required financial statements. Id. at ¶ 207.

Inofin engaged a new accounting firm that began work to prepare the financial statements required by the Division of Banks. Id. at ¶ 208. In December 2010, the new accounting firm concluded that it could not express any opinion regarding the required financial statements because Inofin management was either unable or unwilling to produce the financial records necessary to do the audits and review. Id. On January 20, 2011, the Division of Banks entered a consent order requiring Inofin to surrender its license to operate as a subprime auto lender in Massachusetts. Id.

During the pendency of the audit required by Division of Banks, Inofin also engaged Tobin to perform an audit of Inofin's 2009 balance sheet. Id. at ¶ 210. On December 10, 2010, Tobin issued an audit opinion on Inofin's 2009 balance sheet. According to the

_____

of Inofin's loan portfolio. George collected the cash and used the money to pay investors, but did not record approximately $778,000 in fees paid to MAF. George also continued to record approximately $1,045,000 of accruing interest on the retail auto loans that had been sold off to MAF.

audited balance sheet, by the end of 2009 (nearly 13 months earlier), the company had incurred at least $35 million in accumulated deficits from its inception; the company's liabilities exceeded its assets by approximately $29 million; and the company was therefore insolvent on a balance sheet basis. Id. Tobin in the 2009 balance sheet further disclosed that at least $19 million worth of losses were attributable to loans that Inofin made to the Drive and Prime entities. Id. In the balance sheet notes, Tobin reported that the Drive entities were "insolvent," and therefore their receivables, totaling $12.3 million, had to be "written off in their entirety." Id. In addition, the balance sheet notes reported that the Prime entities' receivables of $13.2 million had a net realizable value of $6.4 million, resulting in a write down of assets of $6.8 million. Id.

On or about December 31, 2010, Inofin sent Tobin's audit opinion and balance sheet to Inofin's investors along with a cover letter that attempted to explain the causes of Inofin's financial decline. Id. at ¶ 211.[15] Following receipt of the disclosure, on February 9, 2011, a group of Inofin's investors filed an involuntary petition against Inofin. As of March 16, 2011, the Debtor's Schedule F-Creditors Holding Unsecured Nonpriority Claims identified unsecured creditor claims totaling $69,296,322.96.

I. Damage Claims

Through Count I of his Complaint, the Trustee seeks damages against the Defendants for negligence and through Count II the Trustee seeks damages for breach of

---

[15] The SEC complaint contained the allegation that Cuomo and Mann, not Inofin, sent the audit opinion to investors.

contract for failing to produce review reports for the 2007 through 2008 year end statements in accordance with SSARS and for failing to exercise the skill and knowledge generally possessed by certified public accountants and members of the accounting profession who hold themselves out as qualified to prepare reviews of financial statements.  He seeks a judgment against the Defendants  as follows:

> (a) those portions of the unsecured creditors' claims that arose after the dates Tobin performed the reviewed financial statements for which he was engaged in 2007, 2008 and 2009; (b) the amount by which Inofin's insolvency deepened after 2007, thereby substantially reducing the funds available for distribution to Inofin's creditors; and (c) all other damages caused by Tobin's and Tobin and Associates' failures to properly perform the accounting services for which they were engaged.

## IV. THE DEFENDANTS' MOTION TO DISMISS

The Defendants move to dismiss Counts I and II because 1) Inofin cannot assert a cause of action or establish causally related damages for so-called "deepening insolvency"and because of the *in pari delicto* defense; 2) There are no allegations that Tobin knew or should have known that its accounting work would result in any harm to Inofin; 3) The statute of limitations has run on any claims arising out of the Defendants' preparation of financial statements for Inofin; 4) The Defendants cannot be liable for breach of contract; 5)  The Trustee has no standing to bring the claims on behalf of creditors; and 6) There are no factual allegations sufficient to show that Tobin breached any duty to the creditors.

## V. CORE  VERSUS NON-CORE

The Trustee, in his Complaint, asserted that all counts in his Complaint involved core matters. The Defendants did not contest the Trustee's assertion. Nevertheless, "a bankruptcy court 'must examine each cause of action separately to determine if it is core or non-core.'" Gold v. Deloitte Touche, LLP (In re NM Holdings Co., LLC), 405 B.R. 830, 837 (Bankr. E.D. Mich. 2008), adopted by 411 B.R. 542 (E.D. Mich. 2009), aff'd, 622 F.3d 613 (2010)(citing Bliss Technologies, Inc. v. HMI Indus., Inc. (In re Bliss Techs., Inc.), 307 B.R. 598, 602 (Bankr. E.D. Mich. 2004)).

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1),[16] and L.R. D. Mass. 201. The Court finds that the Trustee's claims for professional negligence and breach of contract are non-core. Controversies "arise in" title 11 when they "have no existence outside of the bankruptcy." United States Trustee v. Gryphon at the Stone Mansion, Inc., 166 F.3d 552, 555 (3rd Cir. 1999); see also N.E. Power & Marine, Inc. v. Town of Tyngsborough (In re Middlesex Power Equip. & Marine, Inc.), 292 F.3d 61, 68 (1st Cir. 2002). Claims "arise under" title 11 if the claims "clearly invoke substantive rights created by bankruptcy law." In re Middlesex Power Equip. & Marine, Inc., 292 F.3d at 68; Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 70 (2d Cir.2002). Because Counts I and II neither arise in title 11 nor arise under title 11, they are related-to the Debtor's bankruptcy case. Therefore, the Court is

---

[16] See 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "district courts have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Under § 157(a), a district court may refer "any and all cases under title 11 and any all proceedings arising under title 11 or arising in or related to a case under title 11" to bankruptcy judges.

required to submit proposed findings of facts and conclusions of law to the district court

for review, absent the consent of the parties. *See* 28 U.S.C. § 157(c)(1).  *See also* O'Toole v.

McTaggart (In re Trinsum Group, Inc.), 467 B.R. 734, 740-41 (Bankr. S.D.N.Y. 2012).

## VI. POSITIONS OF THE PARTIES

The Court shall address each of the Defendants' arguments and the Trustee's

responses seriatim.

A. Deepening Insolvency and *In Pari Delicto*

The Defendants maintain that the Trustee has no claim against them because there

is no cause of action or recovery for "deepening insolvency" in Massachusetts.  Relying

upon Baena v. KPMG LLP, 389 F.Supp.2d 112 (D. Mass. 2005), *aff'd,* 453 F.3d 1 (1st Cir.

2006), and Boles v. Filipowski (In re Enivid, Inc.), 345 B.R. 426 (Bankr. D. Mass. 2006), they

argue as follows:

> [T]he federal courts in Massachusetts have never recognized deepening
> insolvency either as an independent claim or basis for damages against an
> accountant. Rather, in each such instance where such a cause of action has
> been asserted, the court has rejected the claims against the accountant on the
> basis of *in pari delicto*.  The same result should occur here as all of Inofin's
> "damages" are the result of its own misrepresentations and fraud.

In support of that assertion, the Defendants reference the complaint filed by the SEC against

Cuomo, Mann and George in which the SEC alleged that they knowingly made false

statements regarding Inofin's finances to its investors, Tobin, and the Division of Banks;

that they actually hid the fact that Inofin was losing money on related businesses which it

claimed were actually separate and independent and had been sold to a third party; that

Inofin was providing false and misleading financial information to maintain its license; and

that Inofin was selling assets which it was still reporting as being present and generating income.  For those reasons, the Defendants state that the *in pari delicto* doctrine precludes the Trustee's claims.

In addition, the Defendants emphasize that deepening insolvency has been rejected as a measure of damages, citing, inter alia, <u>Wooley v. Faulkner (In re SI Restructuring, Inc.)</u>, 532 F.3d 355, 363 (5th Cir. 2008), <u>Seitz v. Detweiler, Hershey and Assocs., P.C. (In re CitX Corp., Inc.)</u>, 448 F.3d 672, 677-78 (3d Cir. 2006)("'deepening insolvency' in Pennsylvania is defined as 'an injury to [a debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life;" it is not a viable theory of damages for a malpractice claim), and <u>Bowler v.  Arthur Andersen, LLP</u>, 20 Mass. L. Rptr. 85, 2005 WL 2402875 (Sept. 23, 2005).

The Chapter 7 Trustee maintains that deepening insolvency is a valid theory of damages.  Although he recognizes that neither the Massachusetts appellate courts nor the United States Court of Appeals for the First Circuit have addressed whether deepening insolvency is an independent cause of action or whether it is an independent theory of recovery, he argues that  numerous courts in other states have recognized the theory.  He relies upon <u>Kittay v. Atl. Bank (In re Global Serv. Group LLC)</u>, 316 B.R. 451, 457 (Bankr. S.D.N.Y. 2004).  *See also* <u>Nissan Motor Acceptance Corp. v. Dealmaker Nissan, LLC</u>, No. 7:09-CV-0196, 2012 WL 2522651 at *4 (N.D.N.Y. Jun 27, 2012).

The Trustee, while noting that his Complaint is devoid of any allegations concerning false statements by the Debtor's principals, unequivocally rejects the Defendants' reliance

on the SEC complaint to assert an *in pari delicto* defense.  He relies upon <u>Young v. Lepone</u>, 305 F.3d 1, 10-11 (1st Cir. 2002)("The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint.").  In addition, he points to Final Judgments entered against Cuomo and Mann based upon their written Consents, which contained a recognition that the entry of Final Judgments occurred "[w]ithout admitting or denying the allegations of the complaint (except as to personal and subject matter jurisdiction)."

B.  Proximate Cause

The Defendants also argue that the Complaint fails to state a viable claim for relief because it contains no allegations that the Defendants "knew or should have known" that their work on the financial statements "would result in Inofin squandering, dissipating, diverting or depleting assets of the company."  In short, they assert that the Trustee failed to allege that the Defendants' alleged negligence was the proximate cause of reasonably foreseeable damages or loss. The Defendants add that the Complaint contains no allegations that the financial statements they prepared were used for any other purpose than license renewal by the Division of Banks or that anyone other than the Division of Banks would rely upon them. They argue:

> Under these circumstances, *the damages which would be reasonably foreseeable to an accountant such as Tobin would be of the accountant's error caused their client not to be licensed by the Division of Banks.* But Inofin is arguing the opposite. It alleges that it has been harmed because it was allowed to remain in business because it is unable to repay its "investors" monies which they continued to provide to Inofin as investments. It was hardly reasonable for Tobin to foresee that a purported error in determining the net worth of Inofin based upon the viability of the Drive USA stores would equate to damages

resulting from Inofin's misuse of funds loaned to it by third parties.

(emphasis supplied).

The Trustee disagrees, pointing to portions of his Complaint where he alleged that

the Defendants knew their work was to be relied upon by Inofin and the Division of Banks

in connection with Inofin's renewal applications.  In addition, he asserts the Defendants

knew or should have known that if the Division of Banks renewed the license, Inofin would

continue to operate through the incurrence of additional debt in the form of loans from its

investors.[17]  Alternatively, he maintains that the allegations in the Complaint support the

inference that the Defendants knew or should of known that their conduct would cause

harm to the Debtor.

C. The Statute of Limitations

The Defendants maintain the applicable statute of limitations set forth in Mass. Gen.

---

[17] He relies upon the following allegation:

Tobin's failure to understand or properly apply the relevant protocols set
forth in the SSARS to his engagement led directly to Inofin's receiving
successive license renewals for the years 2007, 2008 and 2009. On
information and belief, had the Division of Banks been aware of Inofin's
substantial negative net worth during any of these years, it would not
have renewed Inofin's license. As such, Inofin would have been forced to
cease its business activities and thus would not have been able to continue
soliciting investor loans, which have now become claims against the
Debtor's bankruptcy estate. In addition, had Inofin been forced to cease
business as a result of its loss of its license during any of the years
following 2007, Inofin's insolvency would not have continued to deepen.
Instead, by remaining in business from 2007 through 2010 with an
improperly-obtained license, Inofin substantially reduced the funds that
would be available for distribution to unsecured creditors through the
company's inevitable bankruptcy proceedings.

Laws ch. 260, § 4 have expired with respect to Counts I and II.  They specifically rely on the

allegations in the SEC complaint in which it alleged, according to the Defendants, that

"Inofin knew that the financial statements prepared by Tobin were incorrect since Inofin

had misrepresented its role in the Drive USA stores as well as the financial viability of those

entities."   The SEC added that "Tobin did not impair the value of the loans to the Drive

USA stores based on Inofin's representations, but those financial statements did not reflect

the fact that Inofin had also begun selling some of its loans at a discount to a third party (as

Inofin intentionally concealed this fact from Tobin)." They further maintain that Inofin is

barred from the commencement of an action because the Division of Banks did not force

Inofin to cease operations in 2007, adding "Inofin obviously knew of the alleged 'harm' at

the time because it continued to operate its business after late 2007 and late 2008 and

continued to originate new loans."

Citing the provisions of 11 U.S.C. § 108(a), the Trustee counters that the time within

which he can assert claims as to the Defendants' negligence  (and breach of contract) will

not expire until February 16, 2013, two years from the entry of the order of relief , i.e.,

February 16, 2011.  Citing Newhall v. Posner, No. 03-11279-PBS, 2004 WL 413275 (D. Mass.

Mar. 4, 2004), and Bowen v. Eli Lilly & Co., Inc., 408 Mass. 204, 205-06 (1990), he argues that

the so-called discovery rule pertains with respect to the 2006 consolidated financial

statements.  The Trustee states:

> Here, the Complaint contains sufficient allegations that Inofin was not put on
> notice that it was harmed, nor put on notice as to what the cause of harm
> was, until at least November 2009, when the Division of Banks commenced
> an examination of Inofin and began raising concerns about Inofin's ability to

maintain the minimum financial requirements necessary for licensure. (Compl. ¶ 68.) As a result of this examination, Inofin and the Division of Banks entered a consent order in June, 2010 (the "Consent Order"). Id. As a result of that Consent Order, the Division of Banks required an audit, but forbade Tobin from preparing the financial statements necessary to perform the audit. Id. The new accounting firm hired by Inofin was unable to express any opinion as to the required financial statements because it could not access the necessary information from Inofin. (Id. at ¶ 69.) As a result of the Consent Order, Inofin also engaged Tobin to perform an audit of Inofin's 2009 balance sheet. Tobin's work in that regard revealed, for the first time, that Inofin was insolvent on a balance sheet basis. (Id. at ¶ 70.) The 2009 balance sheet further disclosed that at least $19 million worth of Inofin's losses were attributable to loans that Inofin had made to the Drive and Prime entities. Id. Finally, the balance sheet notes reported that the Drive entities were "insolvent," and therefore their receivables, totaling $12.3 million, had to be "written off in their entirety." Id.

The information disclosed to Inofin in December, 2010, concerning its insolvency due to the loans to the Prime and Drive Entities was clearly and materially different from the content of the financial statements that Tobin had been preparing from 2007 through 2009 for the fiscal years 2006 through 2008, all of which had represented Inofin's solvency. Thus, the Complaint adequately alleges facts that Inofin first learned of the improper accounting by Tobin after November, 2009 and perhaps as late as December, 2010. The Trustee's claim against Tobin for its negligence and breach of contract concerning the reviewed financial statements prepared in 2007 were thus timely filed.

D. Breach of Contract Claim

The Defendants argue that the Trustee's breach of contract claim is indistinct from his claim for negligence, adding that "to bring a breach of contract claim, the Trustee must show that Tobin agreed to perform some service and absolutely failed to do so." In their view, the Trustee's claim that they did not properly perform the services for which they were engaged is a tort claim, not a breach of contract claim.  See Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc., 396 Mass. 818, 823 (1986)("A plaintiff may not . . .

escape the consequences of a statute of repose or statute of limitations on tort actions merely by labelling the claim as contractual. The court must look to the 'gist of the action.'").

The Trustee maintains that he sufficiently stated a claim for breach of contract, citing the engagement letters pursuant to which the Debtor retained the Defendants to prepare reports in accordance with SSARS. He asserts that the preparation of those reports in violation of the provisions of SSARS constituted breach of contract.

E. Standing

The Defendants seek dismissal of the Trustee's Complaint on grounds that he has no standing to recover a judgment for "those portions of the unsecured creditors' claims that arose after the dates Tobin performed the reviewed financial statements for which he was engaged in 2007, 2008 and 2009." In other words, they contend that the Trustee is improperly attempting to assert claims on behalf of creditors of the estate, not the estate itself. *See* Gold v. Deloitte & Touche LLP (In re NM Holdings Co., Inc.), 622 F.3d 613, 624 (6th Cir. 2010), and Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991).

The Trustee, in response, asserts that his claims are for damages to the Debtor caused by the Defendants' conduct, which he is not pursuing on behalf of any individual creditors. He adds that any recovery will benefit the bankruptcy estate and will not be allocated to any particular creditor.

F. <u>No Breach of Duty to Creditors</u>

Finally, the Defendants argue that the Complaint contains no allegations that the

creditors of the Debtor's estate had a professional relationship with them or that they owed

them a duty of care, adding that there were also no allegations that they supplied false

information to creditors or that creditors justifiably relied on any information provided.

Accordingly, they maintain that the Complaint must be dismissed to the extent that it

purports to assert claims on behalf of creditors.  In response, the Trustee reiterates that he

is bringing claims on behalf of the Debtor, not individual creditors.

## VII.  DISCUSSION

A. <u>Dismissal Standard</u>

 In the recent decision in <u>Rivera-Freytes v. Puerto Rico</u>, __ F.Supp.2d __, 2012 WL

4477610 (D. P.R. Sept. 28, 2012), the court articulated the appropriate standard for

evaluating motions to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable to this

proceeding by Fed. R. Bankr. P. 7012.  It stated:

> Rule 12(b)(6) allows the Court to dismiss a complaint when it fails to state a
> claim upon which relief can be granted. When considering a motion under
> Rule 12(b)(6), a "court must view the facts contained in the pleadings in the
> light most favorable to the nonmovant and draw all reasonable inferences
> therefrom . . ." <u>R .G. Fin. Corp. v. Vergara–Nuñez</u>, 446 F.3d 178, 182 (1st
> Cir.2006). "[A]n adequate complaint must provide fair notice to the
> defendants and state a facially plausible legal claim." <u>Ocasio–Hernandez v.
> Fortuño–Burset</u>, 640 F.3d 1, 11 (1st Cir. 2011). When faced with a motion to
> dismiss, "[a] plaintiff is not entitled to 'proceed perforce' by virtue of
> allegations that merely parrot the elements of the cause of action." <u>Id.</u> at 12
> (quoting <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1950 (2009)). Any
> "[n]on-conclusory factual allegations [sic] in the complaint[, however,] must
> . . . be treated as true, even if seemingly incredible." <u>Id.</u> (citing <u>Iqbal</u>, 129 S.Ct.
> at 1951). Where those factual allegations "'allow[ ] the court to draw the

34

reasonable inference that the defendant is liable for the misconduct alleged,'
the claim has facial plausibility." Id. (quoting Iqbal, 129 S.Ct. at 1949).
Furthermore, a court may not "attempt to forecast a plaintiff's likelihood of
success on the merits; 'a well-pleaded complaint may proceed even if . . . a
recovery is very remote and unlikely'. Id. at 13 (citing Bell Atlantic Corp v.
Twombly, 550 U.S. 544, 556 (2007)). The relevant inquiry, therefore, "focuses
on the reasonableness of the inference of liability that the plaintiff is asking
the court to draw from the facts alleged in the complaint." Id. at 13.

Pursuant to Rule 12(b)(6), a court must base its determination solely on the
material submitted as part of the complaint or central to it. Fudge v.
Penthouse Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir.1988). Generally, "a court
may not consider documents that are outside of the complaint, or not
expressly incorporated therein, unless the motion is converted into one for
summary judgment." Alternative Energy, Inc. v. St. Paul Fire & Marine Ins.
Co., 267 F.3d 30, 33 (1st Cir. 2001). *"When . . . a complaint's factual allegations are
expressly linked to — and admittedly dependent upon — a document (the authenticity
of which is not challenged), [however,] that document effectively merges into the
pleadings and the trial court can review it in deciding a motion to dismiss under Rule
12(b)(6)."* Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir.1998)
(internal citation omitted). This is especially true where the plaintiff has
"actual notice . . . and has relied upon these documents in framing the
complaint ." Watterson v. Page, 987 F.2d 1, 4 (1st Cir.1993).

Rivera-Freytes, 2012 WL 4477610 at * 3-*4 (emphasis supplied).  *See also* Stiegele ex. rel

Viisage Tech., Inc. v. Bailey, No. 05-10677-MLW, 2007 WL 4197496 at *1 (D. Mass. Aug. 23,

2007)(noting exception to general rule that matters outside the pleadings in a motion to

dismiss are not considered for official public records, for documents central to plaintiff's

claims or for documents sufficiently referred to in the complaint).

    B. Analysis

        1. *In Pari Delicto*[18]

---

[18] The court in Welt v. Efloor Trade, LLC (In re Phoenix Diversified Inv. Corp.),
439 B.R. 231 (Bankr. S.D Fl. 2010), provided an excellent description of the *in pari delicto*
doctrine.  While referencing Florida law, Massachusetts law is not dissimilar.  It

explained:

> "The doctrine of *in pari delicto* is an equitable doctrine that states 'a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'" <u>Edwards</u>, 437 F.3d at 1152 (citation omitted.); *accord* <u>In re Skyway Commc'ns Holding Corp.</u>, 389 B.R. at 809. This Court looks to state law to determine if an agent's wrongful conduct should be imputed to a corporate principal. <u>O'Melveny & Myers v. FDIC</u>, 512 U.S. 79, 89, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

> Under Florida law,

>> [w]here it is shown, without dispute, that a corporate officer's fraud intended to and did benefit the corporation, to the detriment of outsiders, the fraud is imputed to the corporation and is an absolute defense to the corporation's action against its accounting firm for negligent failure to discover the fraud.

<u>Seidman & Seidman v. Gee</u>, 625 So.2d 1, 3 (Fla. 3d DCA 1992).

If, however, the agent's misconduct is calculated to benefit the agent and harms the corporation, the agent has forsaken the corporation and acts only for himself. <u>O'Halloran v. PricewaterhouseCoopers LLP</u>, 969 So.2d 1039, 1045 (Fla. 2d DCA 2007). In such a case, the agent's misconduct is not imputed to the principal. Courts call this the "adverse interest" exception to imputation of an agent's knowledge and conduct to its principal. <u>Beck v. Deloitte & Touche</u>, 144 F.3d 732, 736 (11th Cir.1998). If an agent's misconduct is not imputed to the principal, then the corporation is free from wrongdoing and is not subject to the *in pari delicto* defense. Jonathan Witmer–Rich & Mark Herrmann, *Corporate Complicity Claims: Why There is No Innocent Decision–Maker Exception to Imputing an Officer's Wrongdoing to a Bankrupt Corporation*, 74 Tenn. L. Rev. 47, 60 (2006). Courts examine whether the corporation received any benefit from the agent's misconduct to determine whether the adverse interest exception applies in a particular case. <u>Seidman & Seidman v. Gee</u>, 625 So.2d 1, 3 (Fla. 3d DCA 1992).

Even if the agent's misconduct is calculated to benefit only the agent, to the detriment of its principal, imputation is still proper where the "sole actor" doctrine applies. <u>O'Halloran v. PricewaterhouseCoopers LLP</u>, 969

The Trustee in his Complaint neither referenced the SEC complaint nor any of the

specific allegations in that complaint pertaining to the conduct of Cuomo, Mann and

George.  Nevertheless, he selected numerous factual allegations from the SEC complaint

and included them in his Complaint, thereby establishing that he was aware of the SEC

complaint and believed that it had some merit.  The essential differences in the two

complaints are that the Trustee contends that the Defendants caused harm to Inofin, while

the SEC alleged in its complaint that the Debtor and its principals, who artfully

manipulated Tobin, masterminded a pervasive, ponzi scheme type fraud on investors.  If

this Court were to consider the SEC complaint, finding that it fits within the exception to

the general rule governing Rule 12(b)(6) motions, *see* Rivera-Freytes, 2012 WL 4477610 at

---

So.2d 1039, 1045 (Fla. 2d DCA 2007). The "sole actor" doctrine provides
that the adverse interest exception to the imputation rule is inapplicable
"where the transaction on behalf of the principal is entrusted solely to the
officer or agent having the knowledge." Id. at 1045 (quotation omitted).
"[W]here the officer in question is the sole representative of that
corporation, there is no one to whom to impart his knowledge and no one
from whom he may conceal it." Gordon v. Basroon (In re Plaza Mortg. &
Fin. Corp.), 187 B.R. 37, 45 n. 6 (Bankr.N.D.Ga.1995) (citation omitted).
When a corporation has multiple officers and directors, the sole actor rule
may apply when "all relevant shareholders and decision-makers were
involved in the fraud." Ernst & Young v. Bankruptcy Servs. (In re CBI
Holding Co.), 311 B.R. 350, 373 (S.D.N.Y.2004), *aff'd in part, rev'd on other
grounds by* 529 F.3d 432 (2d Cir.2008). Courts thus consider whether there
exist relevant decision-makers who are innocent of the fraud. Witmer–Rich
& Herrmann, *supra*, at 62.

Phoenix Diversified, 439 B.R. at 242 (footnote omitted).

37

*4 (citing <u>Beddall v. State St. Bank & Trust Co.</u>, 137 F.3d at 17), then Defendants' grounds

for dismissal of Counts I and II would have substantial merit at this stage of the proceeding.

In <u>Nisselson v. Lernout</u>, 469 F.3d 143 (1st Cir. 2006), the United States Court of

Appeals for the First Circuit, reviewing the allowance of a motion to dismiss *de novo*, set

forth the parameters of the *in pari delicto* defense, which generally prohibits plaintiffs from

recovering damages resulting from their participation in the wrongdoing sought to be

redressed.[19] Before exploring the history and contours of the defense, however, it noted the

---

[19] In pertinent part, the court in <u>Nisselson</u> stated:

As originally conceived, the in pari delicto doctrine forged a defense of
limited utility. Over time, however, courts expanded the doctrine's sweep,
deploying it as a basis for dismissing suits whenever a plaintiff had played
any role-no matter how modest-in the harm-producing activity. *See*
<u>Bateman Eichler</u>, 472 U.S. at 307, 105 S.Ct. 2622. Deploring this overly
commodious construction, the Supreme Court later reined in the doctrine
and returned it to its classic contours. *See* <u>Pinter v. Dahl</u>, 486 U.S. 622, 635,
108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); <u>Bateman Eichler</u>, 472 U.S. at 310-11,
105 S.Ct. 2622. This retrenchment, which governs here, restricts the
application of the in pari delicto doctrine to those situations in which (i)
the plaintiff, as compared to the defendant, bears at least substantially
equal responsibility for the wrong he seeks to redress and (ii) preclusion of
the suit would not interfere with the purposes of the underlying law or
otherwise contravene the public interest. *See* <u>Bateman Eichler</u>, 472 U.S. at
311, 105 S.Ct. 2622 (discussing the doctrine's application to federal
securities laws); *see also* <u>Edwards</u>, 437 F.3d at 1154. Recent Massachusetts
case law mirrors these refinements. *See, e.g.*, <u>Choquette</u>, 836 N.E.2d at
332-33.

While the application of this binary paradigm may vary slightly
depending on the nature of the particular claim asserted, courts
nonetheless speak of a single doctrine. This is because the analysis
ordinarily will be the same across a spectrum of different causes of action.
*See* <u>Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.</u>, 267 F.3d
340, 345-46 (3d Cir.2001); *see also* <u>Coopers & Lybrand</u>, 322 F.3d at 160.

following:

> We review Rule 12(b)(6) dismissal orders de novo, assuming the truth of all
> well-pleaded facts contained in the operative version of the complaint and
> indulging all reasonable inferences in the plaintiff''s favor. *See* <u>McCloskey v.
> Mueller</u>, 446 F.3d 262, 266 (1st Cir. 2006). Facts distilled in that fashion may
> be augmented by reference to (i) documents annexed to it or fairly
> incorporated into it, and (ii) matters susceptible to judicial notice. *See* <u>Centro
> Medico del Turabo</u>, 406 F.3d at 5; <u>Rodi v. S. New Engl. Sch. of Law</u>, 389 F.3d
> 5, 12 (1st Cir.2004). . . .
>
> This case presents an idiosyncratic procedural feature. While most Rule
> 12(b)(6) motions are premised on a plaintiff's putative failure to state an
> actionable claim, such a motion may sometimes be premised on the inevitable
> success of an affirmative defense. *See, e.g.*, <u>In re Colonial Mortg. Bankers</u>, 324
> F.3d at 16; <u>Blackstone Realty v. FDIC</u>, 244 F.3d 193, 197 (1st Cir. 2001); <u>Keene
> Lumber Co. v. Leventhal</u>, 165 F.2d 815, 820 (1st Cir.1948). *Dismissing a case
> under 12(b)(6) on the basis of an affirmative defense requires that "(i) the facts
> establishing the defense are definitively ascertainable from the complaint and the
> other allowable sources of information, and (ii) those facts suffice to establish the
> affirmative defense with certitude."* <u>Rodi</u>, 389 F.3d at 12.

<u>Nisselson</u>, 469 F.3d at 150 (emphasis supplied).  *See also* <u>Gray v. Evercore Restructuring

L.L.C.</u>, 544 F.3d 320, 324 (1st Cir. 2008).  The First Circuit added:

> The reporters are replete with examples of fact-dominated questions,
> normally grist for the jury's mill, that may appropriately be resolved by a
> motion filed pursuant to Rule 12(b)(6). *See, e.g.*, <u>Epstein v. C.R. Bard, Inc.</u>, 460
> F.3d 183, 188 (1st Cir.2006); <u>Rodi</u>, 389 F.3d at 16. The key is whether the
> factual scenario, as pleaded, is clear enough to permit peremptory resolution
> of the dispositive issue. *See* <u>Rodi</u>, 389 F.3d at 16 (explaining that when the
> facts alleged in the complaint preclude a finding in the plaintiff's favor on a
> particular claim or defense, "a court may enter an order of dismissal under
> Rule 12(b)(6)"). When a case hinges on imputation and the pleaded facts,
> construed in the light most flattering to the resisting party, dictate
> imputation, a court is free to decide that question on a motion to dismiss. *See,*

---

<u>Nisselson v. Lernout</u>, 469 F.3d at 152.  *See also* <u>Gray v. Evercore Restructuring L.P.</u>, No.
06-11444, 2007 WL 3104579 at *4 (D. Mass. Sept. 19, 2007), *aff'd*, 554 F.3d 320 (1st Cir.
2008).

> *e.g.*, <u>Baena</u>, 453 F.3d at 8 (affirming dismissal on in pari delicto grounds after
> imputing fraudulent conduct to debtor corporation); <u>Coopers & Lybrand</u>, 322
> F.3d at 164; (noting that the court historically "has affirmed the dismissal of
> . . . claims on the pleadings upon findings that in pari delicto had been
> established in the complaints"); <u>Terlecky</u>, 133 F.3d at 380 (affirming dismissal
> when the debtor "admit[ted] in his complaint that the debtor's own actions
> were instrumental in perpetrating the fraud").

<u>Nisselson</u>, 469 F.3d at 154.  Thus, the First Circuit clearly endorsed application of the
affirmative defense of *in pari delicto* under appropriate circumstances.

In contrast to First Circuit decisions, a number of courts from other jurisdictions have
adopted a more cautious approach, determining that the defense of *in pari delicto* should not
be determined in the context of Rule 12(b)(6) motions.  *See, e.g.,* <u>Welt v. EfloorTrade, LLC</u>
<u>(In re Phoenix Diversified Inv. Corp.)</u>, 439 B.R. 231, 241 (Bankr. S.D. Fla. 2010)("The
affirmative defense of in pari delicto typically requires proof of facts asserted by the
defendant and, as such, is seldom an appropriate ground for granting a motion to
dismiss."); <u>In re Securities Investor Protection Corp. v. R.D. Kushnir Co.</u>, 274 B.R. 768 781-82
(Bankr. N.D. Ill. 2002)(same).

In <u>Phoenix Diversified</u>, the court considered motions to dismiss an adversary
proceeding commenced by a Chapter 7 trustee of a commodities and futures trading and
investment company against EfloorTrade, LLC, the principal broker for the debtor and its
majority owner and controlling person, as well as the debtor's business advisors and
accountants.  The trustee's complaint contained a count against the debtor's accounting
firm and one of its partners, a CPA and a minority owner of the brokerage firm.  In his
complaint, the trustee alleged that the debtor's primary controlling person used the debtor

"to operate a Ponzi scheme, violate the Commodity Exchange Act, and breach his duties

to the Debtor."  439 B.R. at 236.  Additionally, he alleged that the accounting firm and its

partner at the behest of the brokerage firm provided a financial statement to its main

clearing firm and future commodities merchant which they knew to be false.  In response

to the trustee's complaint, the defendants, including the accountants, moved to dismiss on

the ground that the Trustee lacked standing.

The court in Phoenix Diversified rejected the defendants' argument that "'[a]lthough

the existence of [the Debtor's] victims is strangely absent from the Complaint,' the

Complaint is, in effect, seeking to recover on behalf of investors in the Ponzi scheme." 439

B.R. at 239.  The court observed that "[i]n general,  trustee has no standing to sue third

parties on behalf of a debtor's creditors . . . [and] that [a] trustee has standing to pursue

claims that belong to the debtor itself."  439 B.R. at 238. *See also* Shearson Lehman Hutton,

Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir.1991) (holding that a trustee lacked standing

because "[a] claim against a third party for defrauding a corporation with the cooperation

of management accrues to creditors, not to the guilty corporation.").   Although the court

recognized that some courts combine the analysis of standing and *in pari delicto*, it

determined to address the concepts separately. While recognizing that "a sham corporation

cannot suffer injury and, accordingly, a trustee standing in the shoes of that corporation

lacks standing to sue," Phoenix Diversified, 439 B.R. at 240, it determined that the

complaint taken as a whole did not describe the debtor as a sham corporation.  Thus, the

court concluded the trustee had standing and applied the general rule that "[t]he

affirmative defense of *in pari delicto* typically requires proof of facts asserted by the

defendant and, as such, is seldom an appropriate ground for granting a motion to dismiss"

applied. Id. at 242 (citations omitted). The court in Phoenix Diversified concluded:

> The defense may be asserted at the motion to dismiss stage only where the
> facts establishing the defense: (1) are definitively ascertainable from the
> complaint and other allowable sources of information, and (2) suffice to
> establish the affirmative defense with certitude.

Id. (citing Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 325 (1st Cir. 2008))

(quotations omitted). *See also* Baena v. KPMG LLP, 453 F.3d 1, 7 (1st Cir. 2006)(noting that

in the trustee's own version of events, the primary wrongdoers were the debtor's senior

management and that in the ordinary course, Massachusetts courts would not allow the

debtor's managers to sue a secondary accomplice such as KPMG for helping in the wrong).

In Baena, the First Circuit stated:

> The trustee claims that whether the implicated managers' conduct was
> adverse to L & H is a question of fact improperly resolved on a motion to
> dismiss. *See* Wang Labs., Inc. v. Bus. Incentives, Inc., 398 Mass. 854, 501
> N.E.2d 1163, 1167 (1986). "Adverse interest" in the context of imputation
> means that the manager is motivated by a desire to serve himself or a third
> party, and not the company, the classic example being looting. *See* Beck v.
> Deloitte & Touche, 144 F.3d 732, 737 (11th Cir.1998). If there were raw facts
> at issue that (if credited by a factfinder) might make out a claim for looting,
> or if the case for imputation were merely a close one, we might agree with the
> trustee's argument and leave this question to the factfinder.

> But this is not such a case. Nowhere does the complaint suggest that the
> defalcating managers were acting solely out of self-interest or otherwise
> attempting primarily to benefit anyone other than the company through their
> behavior. There are no facts in dispute that would warrant application of the
> adverse interest exception to bar imputation; the trustee's allegations
> (properly relied upon on a motion to dismiss) counsel just the opposite.

Whether or not application of the *in pari delicto* doctrine should depend on

imputation rules borrowed from agency law is debatable. On this and related issues, such as the no-harm argument, conflicting policies are in play: one view stresses the "innocent" stockholders, <u>FDIC v. O'Melveny & Myers</u>, 61 F.3d 17, 19 (9th Cir.1995); the other, such countervailing concerns as maintaining incentives for the proper selection of management, <u>Cenco Inc. v. Seidman & Seidman</u>, 686 F.2d 449, 455-56 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982).

In all events, ordinary agency-based imputation rules appear to operate in Massachusetts, as elsewhere, whether the issue is primary liability of the company or *in pari delicto*. *Cf.* <u>Rea v. Checker Taxi Co.</u>, 272 Mass. 510, 172 N.E. 612, 614 (1930). It is not our job to make new law for Massachusetts by adopting a peculiarly narrow view of the adverse interest exception in *in pari delicto* cases; such alterations, if deemed wise, are for the state courts. *See* Gill <u>v. Gulfstream Park Racing Ass'n.</u>, 399 F.3d 391, 402 (1st Cir.2005).

<u>Baena</u>, 453 F.3d at 8.

Based upon the foregoing authorities, the Court concludes that dismissal of Counts I and II based upon the affirmative defense of *in pari delicto* is unwarranted at this time and the decisions from the First Circuit are distinguishable because in them the allegations set forth in the complaints unequivocally established the availability of the defense. Although the Court finds that the Trustee adopted the SEC complaint as his own with respect to many of the allegations set forth in that complaint, he studiously omitted any references to the conduct of Cuomo, Mann and George. Unlike the situations in <u>Baena</u> and <u>Evercore Restructuring</u>, this Court cannot conclude that the affirmative defense has been established with certitude from the four corners of the Complaint. The Trustee correctly argued that his Complaint, unlike the SEC complaint, contained no allegations that Cuomo or Mann made any false statements about Inofin's finances to the Division of Banks, the Defendants, or the investors and was predicated solely on the misconduct of Tobin. Although the

43

Trustee did not file a motion to strike the SEC complaint as an attachment to the Defendants' Motion to Dismiss, he objected to its use as being outside the four corners of the Complaint.

Although the Court would be inclined to estop the Trustee from challenging the Defendants' reliance on the SEC complaint because of his deft borrowing from that complaint, the Court is mindful that if Cuomo and Mann were called to testify at depositions or at trial they could conceivably adopt positions contrary to those asserted by the SEC as they preserved the "right to take legal and factual positions in litigation or other legal proceedings in which the Commission is not a party."  In addition, in evaluating a motion to dismiss, this Court is merely determining whether the plaintiff has stated claims that are plausible on their face.  *See* Ashcroft v. Iqbal, 556 U.S. 662, 679-80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).  The Court is compelled to observe, however, that if in a future proceeding it were to make a determination that the defense of *in pari delicto* is applicable, the Trustee's negligence claim would be jeopardized as he could not establish either the requisite elements of proximate and actual causation and the concomitant reliance of Inofin on the alleged faulty financial documents produced by the Defendants.  *See* Gold v. Deloitte & Touche, LLP (In re NM Holdings Co., LLC), 405 B.R. 830, 858 (Bankr. E. D. Mich. 2008),[20] *adopted by*, 411 B.R. 542 (E.D. Mich. 2009), *aff'd*, 662 F.3d

---

[20] The court stated:

Gold [the trustee] therefore cannot use the reliance of *third parties* on the Deloitte audit reports to establish causation for Gold's malpractice claim against Deloitte. Rather, to satisfy the causation element of his claim,

44

613 (6th Cir.2010)(the trustee could not use the reliance of third parties on the accountant's audit reports to establish causation for his malpractice claim against it; rather to satisfy the causation element of his claim, which he brings in his capacity as the successor-in-interest to the debtor, the trustee was required to allege that the debtor detrimentally relied on the accountant's audit reports).

### 2. Standing

As noted above, some courts appear to merge the concept of standing with the defense of *in pari delicto.* *See* Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 117-19 (2d Cir. 1991). *But see* Donnell v. Nixon Peabody LLP, No. 12-04084 DDP, 2012 WL 3839402 at *5 (C.D. Cal. Sept. 5, 2012) (rejecting so-called Wagoner rule that a trustee who stands in the shoes of an entity that was wholly owned and operated by the perpetrator of a fraudulent scheme has no standing to sue third parties who allegedly failed to stop the scheme). Notably, the United States Court of Appeals for the First Circuit did not merge the concepts in Nisselson v. Lernout, 469 F.3d at 150 ("The district court characterized both the in pari delicto doctrine and the absence of cognizable injury as evincing a lack of standing. . . . Part

---

which he brings in his capacity as the successor-in-interest to Venture, Gold must allege that Venture detrimentally relied on Deloitte's audit reports. As stated above, Gold did not allege this in his First Amended Complaint. And as discussed below, even if Gold had alleged that Venture detrimentally relied on Deloitte's audit reports, the facts alleged in the First Amended Complaint show that Gold could not prove this.

405 B.R. at 858.

45

of this characterization is inapt: the in pari delicto doctrine does not implicate a plaintiff's

standing to sue but, rather, constitutes an affirmative defense.").

Standing is a threshold issue for a federal court. It involves two distinct theories.

Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). First, a court

must determine whether a plaintiff satisfies the "case or controversy" requirement of

Article III of the United States Constitution. In other words, a plaintiff must colorably allege

"an actual injury that is both traceable to the defendant's conduct and redressable by a

favorable decision." Nisselson, 469 F.3d. at 159 (citing Lujan v. Defenders of Wildlife, 504

U.S. 555, 560-62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Ramírez v. Sánchez Ramos, 438 F.3d

92, 97 (1st Cir.2006)). The second component of standing involves prudential standing and

requires a determination of "who may maintain an otherwise cognizable claim." Nisselson,

469 F.3d at 150 (citing Baena, 453 F.3d at 5).

Generally, a Chapter 7 trustee has no standing to sue third parties on behalf of the

estate's creditors. See In re NM Holdings Co., LLC, 663 F.3d 613, 624 (6th Cir. 2010); FDIC

v. Ernst & Young, 967 F.2d 166 (5th Cir. 1992). Nevertheless, in Baena, the First Circuit

recognized:

> [t]hat the creditors will benefit if such a suit is successful does not mean that
> their own claims against KPMG are at issue. They will benefit because they
> have claims against L & H [the debtor], it is bankrupt, and under the plan
> they have access to the company's residual assets; among the assets are such
> claims as L & H may have against KPMG. There is no threat that such a
> creditor or any other plaintiff will be allowed to recover twice for the same
> loss.

453 F.3d at 5.

46

Although the Defendants focused on the Trustee's effort to recover a judgment for those portions of the unsecured creditors' claims that arose after the dates Tobin performed services as an effort to recover damages for the Debtor's creditors, the Trustee maintains that he established his standing by setting forth claims for damages to Inofin caused by Tobin's conduct with any recovery benefitting the estate, not individual creditors. Specifically, he points to his allegations in the Complaint that the injuries were sustained by Inofin as the alleged negligence of the Defendants enabled Inofin to stay in business and concomitantly solicit investor loans which have become claims against the Debtor's estate.[21]

---

[21] In Baena, the First Circuit further observed:

Of more interest is a different "standing" objection that KPMG asserted in the district court; whether KPMG is renewing the objection on this appeal is unclear, but if it were a valid Article III objection we would have to dismiss sua sponte. Spenlinhauer v. O'Donnell, 261 F.3d 113, 120 (1st Cir.2001). This is the argument that inflating its earnings cannot have injured L & H itself: at worst, this inflation led L & H to borrow and expend money on the strength of its false documents-but for which L & H received valuable assets in the acquisition of Dictaphone and Dragon.

The intuitive appeal of such arguments is that where a company inflates its earnings, the victims may appear to be only others (who loan it money or buy its stock) and the company may seem to be the culprit rather than an "injured" party. Yet, if one looks at long-term consequences, the company may suffer as well (witness Enron). Federal courts have been unsympathetic to this kind of "no harm" argument, devising counter-doctrines to answer it. *E.g.,* Schacht v. Brown, 711 F.2d 1343, 1348 (7th Cir.) ("deepening insolvency"), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983).

How Massachusetts would view the argument is unclear, but this "no harm" argument does not have the look and feel of an Article III objection. That L & H "in fact" suffered harm from KPMG's alleged wrongdoing is colorably asserted, the trustee has authority to act as plaintiff with respect

The measure of damages alleged by the Trustee are not dissimilar to those sought

by the Trustee in <u>Silverman v. KPMG LLP (In re Allou Distribs., Inc.)</u>, 395 B.R. 246 (Bankr.

E.D.N.Y. 2008), discussed in detail below.  The Court finds that the Trustee has sufficiently

alleged damage to the Debtor and has established standing sufficient to withstand the

Defendants' Motion to Dismiss.  The Court can easily infer damage to the Debtor resulting

from its continued operations and infer that the Division of Banks would have halted its

operations by rejecting its renewal applications if Tobin had insisted on a valuation

allowance or impairment for the Drive entities' loans.

### 3. Statute of Limitations/Breach of Contract Claim

In Massachusetts, the applicable time period for commencing an action for

malpractice by a certified public accountant is three years. *See* Mass. Gen. Laws ch. 260, §

4 ("Actions of contract or tort for malpractice, error or mistake against attorneys, certified

public accountants and public accountants . . . shall be commenced only within three years

next after the cause of action accrues."); <u>Kennedy v. Goffstein</u>, 62 Mass.App.Ct. 230, 815

N.E.2d 646, 648 (2004) (applying statute to accounting malpractice claim).  Section 108 of

---

to such a claim, and any injury can be redressed with damages. This is a
controversy perfectly fit for judicial resolution under Article III. Whether
state law permits recovery for misconduct providing a short-term benefit
to, but inflicting long-term injury on, the company is probably best viewed
as a merits issue which we need not resolve.

<u>Baena</u>, 453 F.3d at 5-6.

the Bankruptcy Code, *see* 11 U.S.C. § 108(a),[22] as well as the so-called discovery rule and the

continuing representation doctrine may be available to extend the applicable statute of

limitations.

According to the court in RTR Techs., Inc. v. Helming, 815 F.Supp.2d 411 (D. Mass.

2011), "[w]here a complaint presents multiple causes of action, courts look to the "essential

nature" of the plaintiff's claims to determine the applicable statutory period. Id. at 420

(citing Desmond v. Moffie, 375 F.2d 742, 743 (1st Cir.1967), and Hendrickson v. Sears, 365

Mass. 83, 310 N.E.2d 131, 133 (1974)).    In Helming, the court added: "The law in

Massachusetts is clear that a plaintiff cannot double the length of the limitations period in

this circumstance by simply re-casting a malpractice claim as an action for breach of a

contract." 815 F.Supp.2d at 420 (citing Anthony's Pier Four, Inc. v. Crandall Dry Dock

Eng'rs, Inc., 396 Mass. 818, 489 N.E.2d 172, 175 (1986)).    The court in Helming considered

---

[22] Section 108 provides in pertinent part:

(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy
proceeding, or an agreement fixes a period within which the debtor may
commence an action, and such period has not expired before the date of
the filing of the petition, the trustee may commence such action only
before the later of--

> (1) the end of such period, including any suspension of such
> period occurring on or after the commencement of the case;
> or
> (2) two years after the order for relief.

11 U.S.C. § 108(a).

that "[p]ermitting this kind of stratagem would render the three-year statutory deadline

for filing malpractice actions against accountants meaningless."  815 F.Supp.2d at 420.

The court in <u>Helming</u> also noted that Massachusetts has adopted the so-called

"discovery rule," which provides that "the statute of limitations begins to run when a

plaintiff 'knows or reasonably should know that he or she has sustained appreciable harm

as a result of the [defendant's] conduct.'" <u>Id.</u> (citing <u>Lyons v. Nutt</u>, 436 Mass. 244, 763

N.E.2d 1065, 1068–69 (2002)).  The court, applying the discovery rule to the professional

malpractice of a certified public accountant to bar claims, observed that that rule imposes

a "duty to investigate" on a plaintiff who has cause for concern.  <u>Id.</u> (citing <u>Epstein v. CR</u>

<u>Bard, Inc.</u>, 460 F.3d 183, 188 (1st Cir. 2006)).

In <u>Cambridge Biotech Corp. v. Deliotte & Touche</u>, 6 Mass. L. Rptr. 367, 1997 WL

42516 (Mass. Super. 1997), a case involving an action by a corporation against its

accountants for providing deficient audits to the company, resulting in bankruptcy, the

court determined that the continuing representation doctrine, which arose in the context

of medical malpractice, has been expanded to other professions, including accountants,

applies in Massachusetts. <u>Id.</u> at *2 (citing <u>Cuccolo v. Lipsky, Goodkin & Co.</u>, 826 F.Supp.

763, 768 (S.D.N.Y.1993)).  The <u>Cambridge Biotech</u> court stated:

> The essence of the doctrine is that "when the course of treatment which
> includes the wrongful acts or omissions has run continuously and is related
> to the same original condition or complaint, the accrual comes only at the end
> of the treatment . . . The continuous treatment we mean, however, is
> treatment for the same or related illnesses or injuries, continuing after the
> alleged acts or malpractice, not mere continuity of a general physician-patient
> relationship." <u>F.D.I.C. v. Deloitte & Touche</u>, 834 F.Supp. 1129, 1148-1149 (E.D.
> Ark.1992) (citing <u>Borgia v. New York</u>, 12 N.Y.2d 151 (1962)).

50

As with medical and legal professionals, "[c]ontinuous representation tolls the statute of limitations until an accountant stops rendering professional services to his or her client on a particular matter . . . The mere recurrence of professional services does not constitute continuous representation where the later services performed were not related to the original service." Cuccolo, at 768. Allegations of annual audits, without reference to the same or related problems for which "treatment" was sought, will not support application of the continuous representation doctrine: "[if the doctrine applied in such a case,] it almost certainly would apply in every case involving an accountant that had performed audits for a client in consecutive years. That result is unacceptable, nor is it called for by the doctrine described in Borgia." F.D.I.C., at 1149.

The Supreme Judicial Court has expanded the doctrine of continuous representation to the legal malpractice field, Murphy v. Smith, 411 Mass. 133, 137 (1991), but it has not yet applied it to accountants.

It is true that applying the doctrine in a case where nothing more than consecutive annual audits were involved would mean that any and all yearly audits would amount to continuous treatment, rendering the three year statute of limitations of Chapter 260, § 4, virtually meaningless whenever a defendant accountant had performed consecutive year audits. As the court in F.D.I.C. stated: "[t]he mere possibility of continuous treatment, which can be imagined but which has not been alleged, is not enough. . . ." Id., at 1151.

Cambridge Biotech Corp., 1997 WL 42516 at *2. In a footnote, the court observed:

A motion to dismiss pursuant to Mass. R. Civ. P. 12(b)(6) is a [sic] appropriate vehicle to raise a statute of limitations defense. Epstein v. Seigal, 396 Mass. 278, 279 (1985). And, plaintiff has the burden of proving facts that would take the case outside the impact of the statute of limitations. Franklin v. Albert, 381 Mass. 611, 619 (1980).

Cambridge Biotech Corp., 1997 WL 42516 at *3 n.3.

With respect to the reports prepared by the Defendants for calendar year 2006, the Trustee relies upon the discovery rule, arguing that the Complaint contains sufficient allegations that Inofin was neither put on notice that it was harmed nor put on notice as to what the cause of harm was until at least November 2009, when the Division of Banks

51

commenced an examination of Inofin which culminated in the Consent Order. Accordingly, he maintains that the statute of limitations had not expired at the commencement of the Debtor's case. He also points to his allegations that on September 15, 2008, Tobin issued review reports concerning Inofin's consolidated and unconsolidated financial statements which failed to properly reflect Inofin's negative net worth in its year-end review of Inofin's 2007 consolidated financial statements. He states that with respect to those reports, "[e]ven assuming that Inofin's causes of action against Tobin concerning the 2007 financial statements accrued as early as September, 2008, and without waiving any argument as to the applicability of the discovery rule or continuing representation doctrine," those claims would have expired in September, 2011, after the commencement of the case and therefore the statute of limitations would not expire until February 16, 2013 because of the provisions of 11 U.S.C. § 108(a). Finally, the Trustee relies upon the continuous representation doctrine.

The Defendants' statute of limitations defense, namely that the limitation period began to run in late 2007 when the Division of Banks did not force Inofin to cease operations and the harm to Inofin occurred, is predicated in part upon the SEC complaint and its recitations of the misconduct of Cuomo, Mann and George and application of the in *pari delicto* doctrine. They assert that Inofin knew of its alleged harm when it filed financial statements in conjunction with its License Renewal Applications that it knew to be inaccurate. Because the Court has rejected application of the *in pari delicto* defense at this juncture, the Court finds that the Trustee has satisfied his burden for purposes of the

Defendants' Rule 12(b)(6) motion.

In addition, the Court notes that based upon allegations in the Complaint the continuous representation doctrine arguably applies.  *See* <u>Cambridge Biotech Corp.</u>, 1997 WL 42516 at *2.  In his Complaint, the Trustee did not allege that Tobin performed any accounting services for Inofin other than to review its financial statements in conjunction with its annual renewal applications filed with the Division of Banks.  In addition, he did not allege that Tobin's negligence was associated with any activities other than failures to properly determine the need for a valuation allowance for the loans to the Drive entities with the result that Inofin's negative net worth went undetected by the Division of Banks, thereby enabling Inofin to continue to borrow from investors.

### 4. Proximate Cause/ Sufficiency of Allegations

Under Massachusetts law, to prevail on a negligence claim, the plaintiff must establish that "'(1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage.'" <u>Newman v. European Aeronautic Defense and Space Co. EADS N.V.</u>, No. 09-10138-DJC , 2012 WL 3133991 at *3 (D. Mass. Aug. 1, 2012)(citing <u>Brown v. United States</u>, 557 F.3d 1, 3 (1st Cir. 2009), and <u>Jupin v. Kask</u>, 447 Mass. 141, 146 (2006)). The Defendants do not challenge the sufficiency of the Trustee's allegations that a professional relationship between Inofin and Tobin existed which created a duty to exercise a reasonable degree of care and skill coupled with a violation of that duty.  Instead, they focus on the sufficiency of allegations related to causation and the requirement that the

Trustee sufficiently allege that any losses were a foreseeable consequence of the negligence of the Defendants.

While noting that proximate causation is typically a question for a jury, the Court in <u>Newman</u> observed that in Massachusetts a plaintiff must adduce sufficient evidence to show: "(1) proximate causation, that 'the loss was a foreseeable consequence of the defendant's negligence' and (2) actual causation." 2012 WL 3133991 at * 7 (citing <u>Jorgensen v. Mass. Port Auth.</u>, 905 F.2d 515, 522–23 (1st Cir.1990)).   According to the court in <u>Newman</u>, "[t]he actual causation inquiry consists of two elements: first, that 'the defendant's negligence was a but-for cause of the loss' and second, 'that the defendant's conduct was a substantial legal factor in bringing about the alleged harm to the plaintiff.'" 2012 WL 3133991 at * 7 (citing <u>Jorgensen</u>, 905 F.2d at 524).

In <u>Silverman v. KPMG LLP (In re Allou Distribs., Inc.)</u>, 395 B.R. 246 (Bankr. E.D.N.Y. 2008), KPMG LLP and two other accounting firms moved to dismiss a third amended complaint filed by a Chapter 7 trustee and a secured creditor in which they alleged that each defendant committed malpractice and fraud through their gross negligence and fraud in failing to detect the fraud committed by the debtors' principals during their respective audit years. <u>Id.</u> at 250. As in the instant case, involuntary petitions were filed against Allou Distributors, Inc. and two of its subsidiaries. The remaining subsidiaries eventually filed Chapter 11 petitions, although the Chapter 11 cases were soon converted to Chapter 7 and all the cases were substantively consolidated. Involuntary petitions were also filed against three of the debtors' principals, family members who held 61% of the stock of the parent

of the original debtors.  The plaintiffs alleged that family members engaged in a
"long-running fraudulent scheme" to manipulate the debtors' reported accounts receivable
and inventory and engaged in conduct "to loot the company of its assets" and "enrich
themselves and their friends and relatives, and enhance their standing within their
community." Id. at 253.  They further alleged that the defendants committed malpractice
and fraud by being grossly negligent and/or reckless in failing to detect the fraud
committed by the family members during their respective audit years and their audit
reports were false and misleading.  Id.  The plaintiffs also alleged that if the defendants
"'had properly performed their professional services, Allou would have discovered the
Jacobs' fraudulent activities and could have prevented or reduced the amounts looted by
the Jacobs and the losses sustained as a result thereof.'" Id. at 254. The plaintiffs in Allou
detailed several frauds committed by family members, including falsely inflating accounts
receivable and inventory on the debtors' books and diverting huge sums of cash to
themselves, business associates and friends.  In sum, the plaintiffs in Allou alleged that the
defendants' accounting malpractice prevented the debtor from discovering the fraud of
family members and halting the continued fraudulent activities and resulting losses,
including those resulting from the fraud of family members who caused the debtor to
borrow more than it otherwise would have been able to do.  The borrowing rendered the
debtors unable to pay creditors, deepened the companies' insolvency and prevented them
from filing for bankruptcy at an earlier point in time.  Id. at 281.

    In determining the defendants' motion to dismiss, the court referenced the elements

of a cause of action for professional malpractice in New York, including a requirement that

"'it was reasonably foreseeable that the damage incurred would follow from the wrongful

act.'" Id. at 282. It concluded that the plaintiffs adequately pled the elements of that cause

of action.[23]

The Court finds that Count I of the Trustee's Complaint contains sufficient

allegations to state a facially plausible claim under the Twombly/Iqbal standard. The

allegations in his Complaint mirror those in Allou, where the court observed that "[w]hile

proving this claim may be difficult, the question of the adequacy of proof is not before the

Court." Id. This Court shares those sentiments. If the Defendants can establish with

certitude the defense of *in pari delicto*, then the Trustee may be unable to prove proximate

and actual causation. In other words, if the Debtor did not rely upon audits performed by

Tobin any damage it suffered would not be proximately caused by the Defendants.

Whether the Trustee can establish that it was foreseeable by the Defendants that

Inofin would continue to borrow from investors because its license applications were

renewed as a result of the Defendants' financial reports and in a manner that the SEC has

alleged violated securities laws must await summary judgment or trial. The Court finds

that the Trustee alleged foreseeable damages in the form of damages resulting from the

---

[23] The court stated: "To state a professional malpractice claim under New York
law, a plaintiff must allege that 'there was departure was a proximate cause of the
injury.' As the Second Circuit has found, '[u]nder New York law, 'professional
malpractice[ ] is a species of negligence. As such, its general elements are (1) negligence,
(2) which is the proximate cause of (3) damages.'" 395 B.R. at 259 (citations omitted).

Defendants' "failures to properly perform the accounting services for which they were

engaged."

     5. Deepening Insolvency

In regard to the parties' arguments vis à vis deepening insolvency, the Court notes

that the Trustee did not bring a separate cause of action labeled "deepening insolvency."

Rather, he references that theory as a measure of damages.  The Court notes, however, that,

at least under Pennsylvania law, negligence will not support a claim for damages for

deepening insolvency. *See* <u>Seitz v. Detweiler, Hershey and Assocs., P.C.  (In re CitX Corp.)</u>,

448 F.3d 672, 677-78 (3d Cir. 2006).[24]   According to the court in <u>Crawford v. Zambrano (In</u>

---

[24] The Third Circuit stated:

Seitz must establish harm to CitX-"actual loss or damage"-to support a
negligence action. <u>Id.</u> He alleges harm to it in the form of "deepening
insolvency"-that Detweiler "dramatically deepened the insolvency of CitX,
and wrongfully expanded the debt of CitX and waste of its illegally raised
capital, by permitting CitX to incur additional debt by virtue of the
compilation statements prepared and relied upon by third parties."
Compl. ¶ 32.

This requires us to decide whether deepening insolvency is a viable theory
of damages for negligence (as opposed to whether it is a viable cause of
action-a topic dealt with in section B below). Our only opinion to address
"deepening insolvency," <u>Official Committee of Unsecured Creditors v.
R.F. Lafferty & Co.</u>, 267 F.3d 340 (3d Cir. 2001), defined it, in predicting
Pennsylvania law, as "an injury to [a debtor's] corporate property from the
fraudulent expansion of corporate debt and prolongation of corporate
life." <u>Id.</u> at 347. In that opinion, we concluded that deepening insolvency
was a valid Pennsylvania cause of action. <u>Id.</u> at 344. Although we did
describe deepening insolvency as a "type of injury," <u>id.</u> at 347, and a
"theory of injury," <u>id.</u> at 349, we never held that it was a valid theory of
damages for an independent cause of action. Those statements in <u>Lafferty</u>
were in the context of a deepening-insolvency cause of action. They should

57

re Zambrano Corp.), 478 B.R. 670 (Bankr. W.D. Pa. 2012),

> Although [the] Pennsylvania Supreme Court has yet to formally recognize a
> deepening insolvency cause of action, the United States Court of Appeals for
> the Third Circuit has found that "the Pennsylvania Supreme Court would
> determine that 'deepening insolvency' may give rise to a cognizable injury."
> Lemington, 659 F.3d at 293–94 (citing Official Comm. of Unsecured Creditors
> v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 349 (3d Cir.2001)). In Pennsylvania,
> deepening insolvency is "an injury to [a debtor's] corporate property from

──────────────

> not be interpreted to create a novel theory of damages for an independent
> cause of action like malpractice.

> Also, we note that Seitz did not provide sufficient evidence to allow a
> reasonable jury to find harm. Assuming for the sake of argument that
> Detweiler's financial statements allowed CitX to raise over $1,000,000, that
> did nothing to "deepen" CitX's insolvency. It did the opposite. *Cf.* Sabin
> Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 552-57 (2005)
> (discussing loans). Before the equity infusion, CitX was $2,000,000 in the
> red (using round numbers for ease of discussion). With the added
> $1,000,000 investment, it was thereby insolvent only $1,000,000. Insolvency
> decreased rather than deepened. Any later increase in insolvency ( i.e., the
> several million dollars of debt incurred after the $1,000,000 investment)
> was wrought by CitX's management, not by Detweiler.

> The crux, then, is the claim that the $1,000,000 equity investment allowed
> CitX to exist long enough for its management to incur millions more in
> debt. But that looks at the issue through hindsight bias. As noted, the
> equity investment was hardly harmful to CitX. Its management surely
> misused the opportunity created by that investment; that was unfortunate.
> But they could have instead used that opportunity to turn the company
> around and transform it into a profitable business. They did not, and
> therein lies the harm to CitX. *In any event, "[t]he deepening of a firm's
> insolvency is not an independent form of corporate damage.* Where an
> independent cause of action gives a firm a remedy for the increase in its
> liabilities, the decrease in fair asset value, or its lost profits, then the firm
> may recover, without reference to the incidental impact upon the solvency
> calculation." Id. at 575.

In re CitX Corp., Inc., 448 F.3d at 677-78 (footnote omitted, emphasis supplied).

the fraudulent expansion of corporate debt and prolongation of corporate life." Lemington, 659 F.3d at 294 (citing Seitz v. Detweiler ( In re CitX Corp.), 448 F.3d 672, 677 (3d Cir.2006)). For such a claim to succeed, it is necessary to demonstrate that the Debtor was insolvent and that EZIII proximately caused the Debtor to take on more debt resulting in injury to the creditors. Id. (citing CitX, 448 F.3d at 678). Furthermore, fraud is necessary to support a claim of deepening insolvency, and "a claim of negligence cannot sustain a deepening-insolvency cause of action." Id. (citing CitX, 448 F.3d at 681).

Id. at 689. See also Official Comm. of Unsecured Creditors v. Baldwin (In re Lemington Home for Aged), 659 F.3d 282, 293-94 (3d Cir. 2011)(citing In re CitX Corp., 448 F.3d 677-78); Dixon v. Am. Community Bank & Trust (In re Gluth Bros. Constr., Inc.), 424 B.R. 379, 390 (Bankr. N.D. Ill. 2009). Thus, in Pennsylvania, there may be a separate cause of action for deepening insolvency but deepening insolvency is not a measure of damages, while in New York state the converse is true. See Kittay v. Atl. Bank (In re Global Serv. Group LLC), 316 B.R. 451, 457 (Bankr. S.D.N.Y. 2004). See also Nissan Motor Acceptance Corp. v. Dealmaker Nissan, LLC, No. 7:09-CV-0196, 2012 WL 2522651 at *4 (N.D.N.Y. Jun 27, 2012).[25]

---

[25] The Court in Dealmaker Nissan, stated:

New York law does not recognize "deepening insolvency" as an independent cause of action. Instead, "New York courts regard 'deepening insolvency' as a theory of damages that may result from the commission of a separate tort." In re Global Serv. Group, LLC., 316 B.R. 451, 458 (S.D.N.Y.2004). However, "[t]he distinction between 'deepening insolvency' as a tort or damage theory may be one unnecessary to make . . . [because] [p]rolonging an insolvent corporation's life, without more, will not result in liability under either approach." In re Global Serv. Group, LLC, 316 B.R. at 458. For this reason, a party "seeking to recover for 'deepening insolvency' must show that [the opposing party] prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt." Id. (collecting cases).

59

Thus, it is evident that case law is not consistent and fraud need not always be alleged to recover damages apart from a separate cause of action sounding in tort.  *See* Thabault v. Chait, 541 521, 521 (3d Cir. 2008)(finding trend to recognize deepening insolvency damages under New Jersey law); Redmond v. Kutak Rock, LLP (In re Brooke Corp.), 467 B.R. 492, 511-12 (Bankr. D. Kan. 2012)(court could not identify a principle of Kansas law which would prohibit the recovery of damages sustained as a result of the wrongful prolongation of corporate existence; court predicted the Kansas Supreme Court would allow such recovery); Bowler v. Arthur Andersen, LLP, 20 Mass. L. Rptr. 85, 2005 WL 2402875 at *14 (Mass. Super. 2005)(citing Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340 (3d Cir. 2001) and stating in dicta that deepening insolvency as a theory of damages "makes sense" under certain circumstances).  *But see* Wooley v. Faulkner (In re SI Restructuring, Inc.), 532 F.3d 355, 363 (5th Cir. 2008)(rejecting deepening insolvency as both a cause of action and a theory of damages); Official Comm. of Unsecured Creditors v. BNP Paribas (In re Propex Inc.), 415 B.R. 321, 331 (Bankr. E. D. Tenn. 2009)(rejecting deepening insolvency as a distinct tort or as a theory of damages); Trenwick Am. Litig Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 204-206 and n.105 (De. Ch. 2006), *aff'd,* 931 A.2d 438 (Del. 2007)(stating that "[t]he concept of deepening insolvency has been discussed at length in federal jurisprudence, perhaps because the term has the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate

---

2012 WL 2522651 at *4 (footnote omitted).

emptiness.").

In the absence of definitive case law from the Supreme Judicial Court of Massachusetts as to the viability of deepening insolvency as a separate cause of action or as a measure of damages, the Court finds that dismissal of the Complaint tied to a prohibition of damages resulting from the prolongation of Inofin's life is premature at this juncture.   The Trustee has stated a plausible theory of damages due to negligence unmoored to damages predicated upon deepening insolvency,  Accordingly the Court shall not carve out deepening insolvency from the Trustee's potential damage claim resulting from the Defendants' negligence at this time, subject of course, to the requirement that such damage be foreseeable.

## VIII. CONCLUSION

In view of the foregoing, the Court shall enter an order denying the Defendants' Motion to Dismiss.

By the Court

Joan N. Feeney
United States Bankruptcy Judge

November 8, 2012

61