## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**INOFIN INCORPORATED,**                                    Chapter 7
     Debtor                                    Case No. 10-11010-JNF12-1091

~~~~~~~~~~~~~~~~~~~~~~~~~

**MARK G. DEGIACOMO,**
**CHAPTER 7 TRUSTEE,**
     Plaintiff
v.                                                      Adv. P. No. 12-1091
**TOBIN & ASSOCIATES, P.C.,**
**TOBIN & GONSALVES, P.C.**
**and RICHARD J. TOBIN,**
     Defendants
and
**SANTANDER BANK,**
     Trustee Process Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion for Approval of Trustee Process Attachment

filed by Mark G. DeGiacomo, the Chapter 7 Trustee of the estate of Inofin Incorporated (the

"Trustee"), through which he seeks an order approving an attachment by trustee process in

the amount of $82,325.00 of funds and credits entrusted to, or deposited in the hands of,

Trustee Process Defendant Santander Bank ("Santander") in the name of Defendant, Tobin

& Gonsalves, P. C. ("T & G").  In support of his Motion, the Trustee references a Separate and

Final Judgment (the "Judgment") in the sum of $82,325, plus interest, entered by this Court

on April 8, 2014 in favor of the Trustee and against Tobin & Associates, P.C. ("T & A") with

respect to Counts III and IV of the Trustee's Complaint against Richard J. Tobin ("Tobin") and

T & A, which Complaint was filed on April 19, 2012.  In addition, the Trustee references an

order entered on September 12, 2014 pursuant to which this Court, in the absence of any

objections, granted the Trustee's Motion for Joinder of T & G and Santander, which motion

was filed on August 27, 2014.  In his Motion for Approval of Trustee Process Attachment, the

Trustee asserts claims against T & G as the successor to T & A, stating that T & G's business

is "a mere continuation" of the business of T & A.  He also asserts that T & G is liable for the

Judgment and any future judgments that he might obtain against T & A or Tobin.

     In support of his Motion for Approval of Trustee Process Attachment, the Trustee

submitted the Affidavit of Ashley Whyman, Esq. who authenticated the deposition transcript

of Susan Gonsalves ("Gonsalves"), a 2012 Annual Report of T & A, the Articles of

Organization of T & A, the 2013 Annual Report of T & G, and the Articles of Organization of

T & G.  T & G filed an Opposition to the Trustee's Motion, as well as two UCC-1 Financing

Statements.

     The Court heard the Trustee's Motion for Approval of Trustee Process Attachment and

T & G's Opposition on September 29, 2014.  At the hearing, the Court afforded Gonsalves the

opportunity to file an affidavit. T & G filed Gonsalves's affidavit on  October 1, 2014.  The

Trustee subsequently filed a Reply to which he attached portions of Tobin's deposition

transcript.

2

At the September 29, 2014 hearing, neither party specifically requested an evidentiary hearing. For purposes of determining the Trustee's Motion, the Court finds that the material facts necessary to decide the Motion are not in dispute and the matter is ripe for disposition. *Cf.* Fed. R. Civ. P. 56(a), made applicable to this contested matter by Fed. R. Bankr. P. 7056 and Fed. R. Bankr. P. 9014(c).

Based upon the deposition testimony of Gonsalves and Tobin, Gonsalves's affidavit, and the remaining submissions of the Chapter 7 Trustee, the Court makes the following findings of fact and rulings of law.

## II. FACTS

T & G was formed in early 2012 after T & A ceased operations. Its Articles of Organization were executed on February 12, 2012 and were filed with the Secretary of the Commonwealth of Massachusetts on February 15, 2012, before the commencement of this adversary proceeding by the Trustee, but after the Trustee had transmitted a demand letter to T & A for the avoidance and recovery of allegedly preferential transfers totaling $110,000.

Gonsalves was a former staff accountant and partner in Tobin & Company which merged with T & A. She has worked for and with Tobin for over twenty years. In her affidavit, she stated that she was unaware of the Trustee's demand letter to Tobin and T & A and his preference claims at the time T & G was formed. Gonsalves is the president, clerk and a director of T & G. Tobin is the treasurer and a director. They are both shareholders. Tobin was the president and clerk of T & A, while Gonsalves was the treasurer. They were both directors and shareholders of T & A.

3

Gonsalves testified that, in early 2012, Tobin, who was 70 years old at the time, was planning to retire. Although she and Tobin had been equal owners of the common stock of T & A, she stated that T & G was incorporated to formalize the parties' intent to recognize that she was going to become the principal owner of the accounting practice to be known as Tobin & Gonsalves, P.C. due to Tobin's plan to retire.

T & G engages in the same type of accounting business as T & A, albeit from a different location in a building owned directly or indirectly by Tobin's spouse. According to Gonsalves, the office space was at least partially furnished at the time of occupancy. Tobin at his deposition stated that the book value of the furniture and other assets was zero. T & G used a copier owned by T & A which has since been replaced, but it did not assume any of T & A's contracts for services. It does have, however, the same telephone number and the same email address as T & A. In addition, one employee of T & A, Gonsalves's sister, is now employed by T & G. While T & G uses the same malpractice insurer, and has many of the same clients, Gonsalves's professional license was used for incorporating T & G as a professional corporation. Moreover, T & G opened a different bank account and, significantly, none of T & A's accounts receivable were transferred to T & G. Tobin testified that the accounts receivable of T & A, which totaled about $32,000, constituted "pretty much bad debts" that T & A wrote off.

Gonsalves explained that she was a 50 percent partner with Tobin in T & A and that, when T & G was formed, "Tobin was supposed to be [a] 10 percent [owner], but he ended up keeping 40 percent due to some credit issues I had." She added that, to obtain financing for

4

T & G, Tobin's stake in T & G had to exceed 10 percent. Gonsalves stated that T & G needed

a line of credit as well as a loan to lease a new computer system and software. She testified

that she and Tobin are the named borrowers on the equipment loan and Tobin is a guarantor

of that loan as well. T & G also obtained a line of credit in Tobin's name because of

Gonsalves's poor credit which Gonsalves asserted prevented her from getting a loan for T

& G. Gonsalves also testified that the line of credit is secured by a mortgage on Tobin's home

and that T & G pays interest only on the debt to Tobin.

> In her affidavit, Gonsalves also stated:

> Tobin & Associates [sic] has two outstanding loan obligations: one to Bank of
> America . . . with a current balance of $99,244.87 and one to BayCoast Bank
> . . . with a current balance of $59,173.08.

UCC Financing Statements filed by T & G as exhibits to its Opposition to the Trustee's

Motion, however, clearly identify T & G as the account debtor for the loans. Gonsalves added

that the account balance at Santander was $9,000 when she first learned of the Trustee's

Motion, although she has used the account since to pay bills, including payroll, and the

balance is now less. In addition, Gonsalves stated that the firm's gross revenues for 2013 were

$295,360, most of which is received during or just after tax season.

> According to Gonsalves, T & G has an agreement of indefinite duration to pay Tobin

a stipend of $1,028 every two weeks, via a direct deposit from its payroll account "just for

consulting work and things of that nature." T & G also reimburses Tobin for business

expenses he incurs using a personal credit card. Gonsalves indicated that the stipend was in

lieu of payment for the use of Tobin's name for the new corporation and that the only other

payments made to Tobin are for interest on the equity line of credit he obtained for the benefit of T & G.  In essence, T & G pays Tobin for the good will associated with the name of Tobin & Associates.  Tobin described the arrangement as "a payback," adding "[i]t's a loan in effect."  He indicated that Gonsalves did not purchase the practice per se.  He stated: "there was a new entity set up and the clients went with the new entity."  Gonsalves testified at her deposition that T & G neither purchased nor merged with T & A, adding that, pursuant to a verbal agreement, "[b]asically Tobin & Gonsalves was going to be my corporation.  He was going to semi-retire and then fully retire, and basically I was - - it was going to be my corporation."  In addition, she testified that Tobin is in the office a couple of times per week and stays for varying amounts of time, at his discretion, to assist her with her work or to consult with clients.  Gonsalves indicated that Tobin's role in T & G is substantially limited and his compensation and hours are "drastically less."  According to Gonsalves, while Tobin was president of T & A, he oversaw its day-to-day administrative functions.  In her role as president of T & G, she now has all of the administrative responsibilities.  Consistent with her new role, T & G, as noted above, relied on her professional license to form T & G, although T & A had relied upon Tobin's license.

Gonsalves stated that T & A operated from 10 Court Street Taunton, Massachusetts without a formal lease and paid one-half of the mortgage payments for the property, that when T & G was formed it leased offices at 84 Broadway, Taunton, Massachusetts, and that both offices were in properties owned directly or indirectly by either Tobin or his spouse.  According to Gonsalves, "the structure and amount of rent varied greatly at their respective

6

locations."

## III. DISCUSSION

A. <u>Applicable Law</u>

The Trustee has moved for a trustee process attachment pursuant to Fed. R. Civ. P. 64,[1]

Mass. R. Civ. P. 4.2[2] and Mass. Gen. Laws c. 246, § 28A[3] with respect to the deposit account

---

[1] Federal Rule 64, made applicable to this proceeding by Fed. R. Bankr. P. 7064 provides in pertinent part the following:

(a) Remedies Under State Law – In General. At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.

(b) Specific Kinds of Remedies. The remedies available under this rule include … attachment. . . .

Fed. R. Bankr. P. 64.

[2] Rule 4.2 of the Massachusetts Rules of Civil Procedure provides in pertinent part:

(c) . . . Except as provided in subdivision (g) of this rule, the motion and affidavit or affidavits with the notice of hearing thereon shall be served upon the defendant in the manner provided by Rule 4, at the same time the summons and complaint are served upon him; and the defendant shall also be served with a copy of the trustee summons in cases where attachment has been approved ex parte as provided in subdivision (g) of this rule. Inclusion of a copy of the complaint in the notice of hearing shall not constitute personal service of the complaint upon the defendant. The notice shall inform the defendant that by appearing to be heard on the motion for approval of an attachment on trustee process he will not thereby submit himself to the jurisdiction of the court nor waive service of the complaint and summons upon him in the manner provided by law.

\*\*\*

Inclusion of a copy of the complaint in the notice of hearing shall not constitute personal service of the complaint upon the defendant. The notice

at Santander in the amount of $82,325.00 based upon a theory of successor liability, adding

"[b]ased on the facts detailed above, Tobin and Gonsalves' business operations are a mere

continuation of Tobin and Associates' business operation" and "[t]he Trustee is therefore

likely, if not certain, to prevail on his claim that Tobin and Gonsalves is the legal successor to

Tobin and Associates and therefore liable to the Trustee for Tobin and Associates' debts."

Mass. R. Civ. P. 4.2(c) sets forth the standard for authorizing a trustee process

attachment.  It provides in pertinent part:

No trustee summons may be served unless attachment on trustee process for

_____

shall inform the defendant that by appearing to be heard on the motion for
approval of an attachment he will not thereby submit himself to the
jurisdiction of the court nor waive service of the complaint and summons
upon him in the manner provided by law.

Mass. R. Civ. P. 4.2(c).

[3] Mass. Gen. Laws ch. 246, § 28A provides:

Twenty-five hundred dollars of any natural person in an account in a trust
company, savings bank, cooperative bank, credit union, national banking
association or other banking institution doing business in the
commonwealth shall be exempt from attachment by trustee process. A
trustee summons served on any such institution shall describe the
exemption with reference to this section. Upon service of a trustee summons,
the trustee shall answer as subject to attachment only so much money of the
defendant that exceeds $2,500.

No business, trust or organization shall be entitled to the exemption in this
section and no natural person shall be entitled to more than a $2,500
exemption at any one time. In any action, the plaintiff may apply to the
court for further attachments upon proof by certified records of a trustee
that the defendant has received an exemption not authorized under this
section or that the $2,500 exemption of the defendant has been in whole or in
part exhausted or exceeded.

a specified amount has been approved by order of the court. Except as provided in subdivision (g) of this rule, *the order of approval may be entered only after notice to the defendant and hearing and upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the trustee process over and above any liability insurance shown by the defendant to be available to satisfy the judgment.*

Mass. R. Civ. P. 4.2(c) (emphasis supplied).  The Trustee, citing, among other cases, <u>Anderson Foreign Motors of New England Toyota Distribs., Inc.</u>, 475 F.Supp. 973 (D. Mass. 1979), argues that all he must show is a likelihood of success on his "mere continuation" claim, adding that irreparable injury and a favorable balancing of harms are not required elements.

The Trustee maintains that he has satisfied the factors set forth in <u>Milliken & Co. v. Duro Textiles, LLC</u>, 451 Mass. 547 (2008), with respect to this theory of recovery.  In that case, Milliken & Company ("Milliken") filed an action in state court to recover a trade debt of over $8.5 million owed by Duro Industries, Inc. ("Old Duro").  Milliken sought recovery from Duro Textiles, LLC ("New Duro"), as the corporate successor of Old Duro based upon a successor liability claim and allegations that Patriarch Partners, LLC ("Patriarch"), and related entities, "orchestrated a scheme" to acquire Old Duro's assets, while avoiding its debts to unsecured creditors, including Milliken.  Milliken theorized that there was a "de facto merger" of Old and New Duro or that New Duro was a "mere continuation" of the same business of Old Duro.  451 Mass. at 548.  The case involved a leveraged buyout, a bankruptcy proceeding, a contemplated sale of Old Duro pursuant to 11 U.S.C. § 363, and the ultimate dismissal of Old Duro's bankruptcy case.  On appeal, the Supreme Judicial Court, while noting that terms "de facto merger" and "mere continuation" are often used by courts interchangeably, observed:

"Most jurisdictions, including Massachusetts, follow the traditional corporate law principle that the liabilities of a selling predecessor corporation are not imposed upon the successor corporation which purchases its assets, unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." Guzman v. MRM/Elgin, 409 Mass. 563, 566, 567 N.E.2d 929 (1991). *See* McCarthy v. Litton Indus., Inc., 410 Mass. 15, 21, 570 N.E.2d 1008 (1991). *See also* Dayton v. Peck, Stow & Wilcox Co. (Pexto), 739 F.2d 690, 692 (1st Cir. 1984) (construing Massachusetts law). The public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors. *See* Cargill, Inc. v. Beaver Coal & Oil Co., 424 Mass. 356, 362, 676 N.E.2d 815 (1997).

Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 556 and n. 15. The court added:

The "de facto merger" theory of successor liability "has usually been applied to situations in which the ownership, assets and management of one corporation are combined with those of another, preexisting entity." National Gypsum Co. v. Continental Brands Corp., 895 F.Supp. 328, 336 (D. Mass. 1995). "The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." Cargill, Inc. v. Beaver Coal & Oil Co., *supra* at 359–360, 676 N.E.2d 815. *See* 15 W.M. Fletcher, Cyclopedia of Corporations § 7124.20, at 294–295 (rev.perm. ed. 2008) (discussing elements of "de facto merger"). We have stated that "[n]o single factor is necessary or sufficient to establish a de facto merger." Cargill, Inc. v. Beaver Coal & Oil Co., *supra* at 360, 676 N.E.2d 815.

The "mere continuation" theory of successor liability "envisions a reorganization transforming a single company from one corporate entity into another." McCarthy v. Litton Indus., Inc., *supra* at 21–22, 570 N.E.2d 1008. *See*

National Gypsum Co. v. Continental Brands Corp., *supra* (seller establishes buyer for purpose of continuing business under new form). *See also* 15 W.M. Fletcher, *supra* at § 7124.10, at 282–283 (discussing elements of "continuation of business" theory). "[T]he indices of a 'continuation' are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets." McCarthy v. Litton Indus., Inc., *supra* at 23, 570 N.E.2d 1008. In essence, the purchasing corporation "is merely a 'new hat' for the seller." Id. at 22, 570 N.E.2d 1008, quoting Bud Antle, Inc. v. Eastern Foods, Inc., 758 F.2d 1451, 1458 (11th Cir. 1985). "[T]he imposition of liability on the purchaser is justified on the theory that, in substance if not in form, the purchasing corporation is the same company as the selling corporation." McCarthy v. Litton Indus., Inc., *supra*. *See* 15 W.M. Fletcher, supra at § 7124.10, at 287 ("The 'mere continuation' of business exception reinforces the policy of protecting rights of a creditor by allowing a creditor to recover from the successor corporation whenever the successor is substantially the same as the predecessor"). Similar to the considerations underlying a finding of a "de facto merger," the factors characterizing a continuing corporation are traditional indicators, but no single factor is dispositive, and the facts of each case must be examined independently. *See* 15 W.M. Fletcher, *supra* at § 7124.10, at 283–287.

Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 557-58. *See also* In re QR Props., LLC, 485 B.R. 20, 24-25 (Bankr. D. Mass. 2013).

B. Analysis

The Trustee maintains that he has satisfied the standard set for by the Court in Duro Textiles. T & G disagrees.

The Court concludes that the Trustee has failed to establish a reasonable likelihood of success on his successor liability claim. Application of the elements of a "mere continuation theory or a "de facto merger" theory of successor liability as described above in Duro Textiles results in factors that favor both sides. Although there was some continuity with respect to clients and there was no formal dissolution of T & A, there were significant changes to the corporate structure and operations of the two enterprises. The Trustee, however, has the

burden of proof and when the material facts are aligned in favor of one side and the other they fail to weigh in his favor.  Accordinglyly, his Motion for Approval of Trustee Process Attachment must fail.  *Cf.*  DeBenedictis v. Brady-Zell (In re Brady-Zell), No. 10-10922-FJB, Adv. P. No. 10-1119 (Bankr. D. Mass. April 2, 2013), *aff'd*, 500 B.R. 295 (B.A.P. 1st Cir. 2013), *aff'd*, 756 F.3d 69,  72 (1st Cir. 2014) (affirming bankruptcy court's decision that plaintiff failed in her burden of proof where evidence was "'split about even.'").

The Court finds that T & A's assets, except for the good will associated with Tobin's name, were of inconsequential value and the transfer of assets to T & G does not support the conclusion that there was a de facto merger of the two entities.  The most significant asset of the accounting firm, T & A's accounts receivable, were not transferred by T & A to T & G. According to Tobin, the accounts receivable were uncollectible and written off.  In terms of management, Gonsalves assumed the managerial role in T & G that Tobin previously had undertaken as president of T & A.  Thus, the day-to-day management between the two entities is different.

T & A was, and T & G is, a small accounting practice.  Although denominated professional corporations, both functioned very much like partnerships between Tobin and Gonsalves.  The role of senior partner is not the same.  The revenues received by each firm were and are the result of accounting services performed individually by Tobin and Gonsalves and their small staff of employees for the 300-400 business and individual clients who elected to have their accounting needs attended to by T & G.  With respect to the factors set forth by the Supreme Judicial Court in Duro Textiles, the Court finds that there was

12

insufficient continuity of the day-to-day management to pass the de facto merger test. Tobin, who is in his 70's does not work full time, and Gonsalves stated that Tobin's role is "substantially limited" compared with his role with T & A. With respect to personnel, only Gonsalves's sister transferred from T & A to T & G. The physical location changed, and according to Gonsalves, while the landlord is the same, "the structure and amount of rent varie[s] greatly." While the shareholders and directors are the same, and T & A ceased operations without formally dissolving, T & G did not assume the liabilities of T &A.[4]

## IV. CONCLUSION

In view of the foregoing, the Court concludes that the Trustee failed to establish a likelihood of success on the merits of his successor liability theory. For those reasons, the Court shall enter a judgment denying the Trustee's Motion.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated:  October 17,  2014

---

[4] The Court concludes that Gonsalves's reference to T & A in her affidavit was an unfortunate Freudian slip because the UCC-1 Financing Statement establish the existence of debt owed by T & G to Bank of America and BayCoast Bank, consistent with her deposition testimony.

13